[Criminal No. 418.  Filed November 8, 1917.]

[168 Pac. 508.]

## W. W. BUSH and ASA BROWN, Appellants, v. STATE, Respondent.

1. EXTORTION—COMMON-LAW "EXTORTION."—The common law confined extortion to the unlawful taking by an officer, by color of his office, of any money or thing of value that is not due to him, or more than is due, or before it is due.

2. EXTORTION—NATURE OF OFFENSE.—The purpose of Penal Code of 1913, title 14, chapter 7, relating to extortion, is to include not only those who actually obtain property, but those who obtain a signature to any paper or instrument, whereby, if such signature were freely given, any property would be transferred.

3. EXTORTION—STATUTES—OBTAINING SIGNATURES—PUNISHMENT.— The omission of the word "property" in the last part of Penal Code of 1913, paragraph 516, making extortionate obtaining of signatures "punishable . . . as if the actual delivery of such debt, demand, charge or right were obtained," does not obscure the meaning, and punishment is as provided in paragraph 514.

4. EXTORTION—SUFFICIENCY OF INFORMATION—OBTAINING SIGNATURES. In a prosecution under Penal Code of 1913, paragraph 516, for obtaining extortionately a signature to a bill of sale, an information, stating that it was a bill of sale and its effect, was sufficient without setting out the instrument.

5. STATUTES—PENAL STATUTES—CONSTRUCTION.—A penal statute should not be construed technically, but according to the fair import of its terms, with a view to effect its object and promote justice, and a strained view, should not be sought to set aside an information.

6. CRIMINAL LAW—DISCREDITING WITNESSES—SCOPE.—Where court allowed proof that a witness had been convicted twice for vagrancy, and was guilty of bootlegging, white slavery, forgery, passing worthless checks, and that he frequented the red lights, defendant cannot complain that he was not permitted to show fully the character of the witness.

7. CRIMINAL LAW—DISCREDITING WITNESSES—SCOPE—REGULATION BY THE COURT.—The court should place a reasonable restriction on matters introduced to discredit a witness, and not allow the attention of the jury to be distracted from the main issue by too much reeking evidence as to habitues of the underworld.

8. EXTORTION — THREATS — WHAT CONSTITUTES. — In extortion no precise words are necessary to convey a threat, as they take color and quality from the surrounding circumstances.

9. EXTORTION—THREATS—WHAT CONSTITUTES.—In a prosecution for extortion, evidence of a threat to send a son "over the road" without stating what for, *held*, under the circumstances, to support a conviction.

10. EXTORTION—EVIDENCE—MATERIALITY.—In a prosecution for extortion in obtaining a bill of sale, evidence that on the day after the acts charged defendant tore up the bill of sale and burnt it when the same was redeemed instead of returning it, was material.

11. EXTORTION—OBJECT OF EXTORTION—DISPOSAL OF PROPERTY—MORAL OBLIGATIONS.—To constitute extortion it makes no difference who receives money, or that there was a moral duty to pay it, or that a like amount had been loaned to the son of the person practiced upon.

[As to what is extortion, see notes in 96 **Am. Dec.** 193; 116 **Am. St. Rep.** 446.]

12. CRIMINAL LAW—APPEAL—INSTRUCTIONS—NECESSITY FOR REQUEST. Mere nondirection affords no ground for reversal where a proper instruction covering the point was not requested and refused.

13. CRIMINAL LAW—HARMLESS ERROR—INSTRUCTIONS.—Where a definition of reasonable doubt might imply a stronger doubt than the law requires, it was harmless where there was no sense to the explanation, nothing but a mere jingle of words, as the jury could not have understood it or been misled by it.

14. CRIMINAL LAW—INSTRUCTIONS—REASONABLE DOUBT—NECESSITY TO DEFINE.—In the absence of a request, it is not necessary to define the words "reasonable doubt" in an instruction.

15. CRIMINAL LAW — INSTRUCTIONS — PRESUMPTION OF INNOCENCE — DURATION.—The presumption of innocence remains until by the return of the verdict the defendant is found guilty, and it was error to instruct that it continues "until such time in the progress of the case as you may be satisfied beyond a reasonable doubt."

16. CRIMINAL LAW—HARMLESS ERROR—INSTRUCTIONS.—An instruction that defendant was presumed innocent until in the progress of the case the jury is satisfied of guilt beyond a reasonable doubt was harmless, where the jury were several times admonished not to form any opinion until final submission.

17. CRIMINAL LAW—HARMLESS ERROR.—The line which separates prejudicial from nonprejudicial error cannot be completely settled, but only in each case as the question may arise.

APPEAL from a judgment of the Superior Court of the county of Pinal. O. J. Baughn, Judge. Affirmed.

Mr. F. C. Jacobs and Mr. Charles H. Studley, Jr., for Appellant.

Mr. Wiley E. Jones, Attorney General, Mr. Geo. W. Harben and Mr. R. Wm. Kramer, Assistant Attorneys General, Mr. H. G. Richardson, County Attorney, and Mr. Benton Dick, for the State.

FRANKLIN, C. J.—At a preliminary examination Asa Brown and William W. Bush were held to answer for the crime of extortion. They were tried jointly upon an information based upon facts coming within the provisions of paragraph 516 of the Penal Code, and convicted. Hence this appeal. The objection is urged that the information upon which the defendants went to trial does not state the same offense for which, on their preliminary examination, they

were held to answer. Under the heading "Extortion," in chapter 7, title 14 of the Penal Code of 1913, paragraph 512, the crime of extortion is defined to be the obtaining of property from another with his consent induced by wrongful use of force or fear or under color of official right. It is next provided in paragraph 513 that fear such as will constitute extortion may be induced by a threat, either (subdivision 2, the only one applicable here) to accuse a person or any relative of his or member of his family of any crime. In paragraph 514 the punishment for the offense when accomplished under circumstances not amounting to robbery is fixed at imprisonment in the state prison not exceeding five years. Paragraph 516 under which the information is drawn provides:

"Every person who, by any extortionate means, obtains from another his signature to any paper or instrument; whereby, if such signature were freely given, any property would be transferred or any debt, demand, charge or right of action created, is punishable in the same manner as if the actual delivery of such debt, demand, charge or right of action were obtained."

The common law confined extortion to the unlawful taking by an officer, by color of his office, of any money or thing of value that is not due to him, or more than is due, or before it is due. 8 R. C. L., § 315, p. 293. The Penal Code, however, has enlarged the scope of this offense so as not to confine the commission of it to those persons who act under color of official right. Under the statute we have a very comprehensive crime which is not restricted to the obtaining of property, but which includes within the express terms those cases where a person obtains from another with the latter's consent, induced by wrongful use of force or fear or under color of official right, that person's signature to any paper or instrument, whereby, if such signature were freely given, any property would be transferred, or any debt, demand, charge, or right of action created. The obvious purpose of the statute is to make not only those who actually obtain property by extortionate means come within its purview, but to extend it also to those persons who by extortionate means obtain from another his signature to any paper or instrument, whereby, if such signature were freely given, any property would be transferred.

It is urged that the court erred in sentencing the defend-
ants to confinement in the state prison for the reason that the
statute under which they were prosecuted does not provide
for such punishment.   The objection is made because in the
last part of paragraph 516 the language reads, " . . . is pun-
ishable in the same manner as if the actual delivery of such
debt, demand, charge or right of action were obtained,"
omitting from the enumeration the word "property" used in
the first part of the paragraph.   It is clearly the intent of
this statute to make the acts therein mentioned punishable
in the same manner as if the property described in the instru-
ment was actually obtained by extortionate means.   The
omission of the word "property" in this connection does not
obscure the meaning of the statute in the least degree.   Omit-
ting the word "property" the language used describes the
statute fixing the punishment with such certainty that there
can be no doubt it is as clearly identified as if the legislature
had said, " . . . is punishable as provided in paragraph
514."   The information is said to be defective because it
does not set forth the bill of sale alleged to have been signed
or account for such failure.   The instrument alleged to have
been signed is stated to be a bill of sale and the legal effect
pleaded.   It is not perceived that such omission tended in
any way to the prejudice of the defendants.

It is the duty of this court under the law to construe a pro-
vision of the Penal Code not technically, but according to the
fair import of its terms, with a view to effect its object and
to promote justice.   So if an information can lawfully be
upheld, the court should uphold it and not seek a strained
view of the law to set it aside.

It is complained that the defendants were not permitted
to show fully to the jury the character of the witness Arthur
Sellick; that they should have been permitted to show that
he had been arrested for vagrancy and the disposition of that
case.   The court allowed proof that Sellick had been arrested
and convicted twice for vagrancy, that he had been arrested
for bootlegging, white slavery, forgery, passing a check on a
bank in which he had no funds, that he was a frequenter of
the red light district in Winkelman.   Not only as to this wit-
ness, but as to several of those for the defense, the record
fairly reeks with the odor of the underworld, and the goings,
comings and doings of habitues of the red light.   The proper

criticism is that the court placed no reasonable restriction on this class of testimony, allowing the attention of the jury to be distracted from the main issue. The multiplicity of these particulars should have been considerably abridged.

Arthur Sellick, who is the son of Mrs. Hannah L. Young, had forged the name of W. T. Armstrong to a check for $20. The defendant Bush was the marshal of the town of Winkelman, and at his request defendant Brown had arrested Sellick on this charge of forgery. On the night of November 30, 1915, the defendants Bush and Brown went to Mrs. Young's house with Arthur Sellick in custody. Mrs. Young knew that her son had forged Armstrong's name to a check. When Brown and Bush arrived at the house with Sellick they found Mrs. Young in her bedroom sick in bed. Mrs. Young is about fifty-five years of age, and appears to be an invalid suffering with nervous prostration. The defendant Bush informed Mrs. Young that her son was under arrest, and said it had to be settled that night; that Mr. Ming would take twenty-five head of cattle at thirty dollars a head, and he [Bush] would make out a bill of sale. Mrs. Young did not want to sell Ming any cattle. Rather than do so she would get up and dress and go over to see Luke Reay that night, and whatever money was necessary she would get it from him. She did not want Ming to have the cattle. She told Bush she could not give the bill of sale. Bush told her she need not mind about that because she could come and redeem the bill of sale, but if she refused to sign the bill of sale that night her son would be put over the road. Fearing this, Mrs. Young signed and acknowledged the bill of sale which had been drawn up by defendant Bush.

No precise words are necessary to convey a threat. Conduct takes its legal color and quality more or less from the circumstances surrounding it. All that is necessary is that the alleged threat be definite and understandable to the mind of ordinary intelligence. It is absurd to contend that a threat to accuse one of crime must contain all of the statutory elements for the offense with which the party expects to charge another. If such were the rule the operation of the statute would be practically suspended. It is impossible to come to the conclusion that the language used was not such as Mrs. Young might fairly interpret as a threat to accuse her son of the crime of forgery, unless she signed the bill of sale,

and that she did not through fear induced by such threat finally execute the instrument.

What took place next morning when Mrs. Young went to the office of Bush with $750 to redeem the bill of sale was material testimony. She paid the money to Bush and demanded the return of the bill of sale. Bush took the money and refused to give her the bill of sale, saying it was no longer any good; he tore it into pieces and burned them in the stove. The court instructed the jury that it made no difference who actually received the $750. It is claimed the instruction deprived defendants of the benefit of their entire defense. We find no fault with this instruction whether it relates to the money paid by Mrs. Young to Bush to redeem the bill of sale, or whether it relates to the $750 which the witness Ming says he advanced to Arthur Sellick with the understanding that the latter would get his mother to execute a bill of sale of thirty head of cattle to repay the money so advanced.

Much of the record is devoted to a series of previous transactions wherein Bud Ming had advanced various sums of money to this Arthur Sellick, who is characterized by the defendants as an idle, vicious, and dissolute person unworthy of belief, and it is shown that his mother had always come to his assistance. Grant all this to be true, it is no defense on the part of Brown and Bush. It only emphasizes the love of a mother for her boy, and perhaps that this boy was a willing party in many instances to extort property from his mother. But however unworthy he may have been of her affection, it is the nobility of womanhood to help the weak and distressed. She may glow with pride for the vigor and character of her offspring, but the intensity of her love and care will burst aflame for the weak one. The mother is ever ready to kill the fatted calf for her prodigal son. This instinct to protect, stronger even than her own self-preservation, is implanted in the mother to sustain and advance the race. The more the shame then and the moral turpitude on the part of these defendants in going to this old lady under these circumstances. They found her sick in bed, and observed her torn between two desires—one to save her property, and the other to protect her boy against his folly and dissipation. They then played upon the latter feeling to extort from her the bill of sale.

The crime charged did not consist in the dealings that Ming had with Arthur Sellick, but in the extortionate means which Bush used to get Mrs. Young's signature to the conveyance, and in which he was knowingly aided and abetted by Brown. Arthur Sellick may have been guilty of the crime of forgery, his career of folly may have been advanced by Ming loaning him money to dissipate. Bush and Brown may have been justified in arresting him for forgery. They may have honestly believed that their friend Ming had loaned Arthur Sellick $750 on a promise of the latter to get a bill of sale from his mother for thirty head of cattle. Bush and Brown may have considered that Mrs. Young was morally bound to execute the bill of sale to Ming. Granting all this, it is no justification whatever for the conduct of Bush and Brown in making the threat to Mrs. Young. The gist of the offense is the obtaining of the bill of sale by extortionate means. Not in making the charge of forgery against the son and having him under arrest, but in threatening the mother that unless she signed the bill of sale her son would be prosecuted upon such charges and in getting her signature to the paper because of a fear induced by the threat. If these defendants obtained Mrs. Young's signature to the instrument through fear induced by a threat to accuse her son of a crime, it was obtained by the wrongful use of fear as defined by the statute.

Errors are assigned because the court failed to instruct the jury as to certain matters. Mere nondirection by the court below affords no ground for reversal, where a proper instruction covering the point was not requested and refused. *Vincent* v. *State*, 16 Ariz. 297, 145 Pac. 241.

Objection is made because the court attempted to define the expression "reasonable doubt." Among other things, the court said it is a "serious, substantial doubt." In the absence of a request tendering a proper instruction, it was unnecessary to attempt to define the expression, because it is commonly understood. The expression was invented by great common-law judges as one most simple in its appeal to the understanding of men of ordinary intelligence. Chamberlayne says:

"Usually such attempts at explanation tend rather to confuse and bewilder than to clarify."

If the attempt of the trial judge had any tendency at all it was to render an understandable expression vague and

obscure, and perhaps implied a stronger doubt than the law requires. However, it does not appear to have been prejudicial, because there is no sense to the explanation, nothing but a mere jingle of words, and as the jury could not have understood it, therefore they could not have been misled by it. Wigmore has observed well that these attempted definitions are unserviceable except to aid the purposes of the tactician in the reversal of cases. When a trial court is called upon to explain the expression it is better to follow a well-established and approved one. *Roberts* v. *State,* 17 Ariz. 159, 149 Pac. 380.

Objection is made because the jurors were told that the presumption of innocence remains with the defendants throughout the case "or until such time in the progress of the case as you may be satisfied of their guilt beyond a reasonable doubt." Here again there is palpable error. The presumption of innocence remains throughout the case and until it is finally submitted to the jury and by the return of their verdict the defendant is found guilty. But here again we do not think it reversible error. At each recess the trial court admonished the jury not to form or express any opinion with reference to the case, nor come to any conclusion with reference to it until the case is finally submitted. Because of these repeated admonitions, this erroneous instruction at the end of the trial could not have misled the jury. Other errors committed by the trial court have been called to our attention.

These 30 assignments have each been carefully examined in the light of the record presented, and the separate consideration of each one would extend this opinion far beyond what is justifiable. Without more particular discussion, our conclusion is that the errors made are not such as would justify this court in saying that a miscarriage of justice has occurred. The Constitution commands this court not to reverse a cause when upon the whole case substantial justice has been done. A conscientious effort to follow the spirit of this constitutional admonition is often attended with perplexity because of errors committed in the trial of a cause more or less vital in their bearing in the case. Judges are fallible, and it is to be expected that error will occur however erudite and painstaking the judge may be, but it is not hypercritical to say that in some instances error is so mani-

fest as easily to have been avoided by a little more care and attention on the part of the presiding judge.   Obviously it is a delicate duty for an appellate court to say how far a jury may have been controlled in their verdict on this account, and to mark the lines wherein such errors do or do not affect a substantial right, or do or do not deprive a defendant of that fair and impartial trial which the law guarantees to each one charged with the commission of crime, and this without regard to his station or condition, the character of the crime imputed against him, or the state of public sentiment in his disfavor.

With respect to the line which separates prejudicial from nonprejudicial error, it may never be completely or satisfactorily settled, but only in each case as the question may arise and as the capacity of the particular court may be equal to the occasion of ascertaining when substantial justice has been done.   Bearing in mind this duty to be performed, the record presented has been scrutinized, and we are persuaded that had the record been free of the errors suggested for reversal the verdict of the jury would not have been otherwise.   In this case the evidence in behalf of the state, if believed by the jury, is clear and convincing that the defendants are guilty of a most reprehensible crime in getting by extortionate means the bill of sale from this practically helpless old lady, and it required no close reasoning upon their part to come to the conclusion of the defendants' guilt.

It is, therefore, upon consideration of the whole case that the judgment must be affirmed; and it is so ordered.

CUNNINGHAM and ROSS, JJ., concur.

----

Authorities discussing the question as to whether efforts to collect debt is extortion are collated in notes in 18 **L. R. A.** (N. S.) 77; **L. R. A.** 1915B, 1140.