[Crim. No. 14227.   Second Dist., Div. One.   May 3, 1968.]

THE PEOPLE, Plaintiff and Appellant, v. OLIVER MASSENGALE, JR., et al., Defendants and Respondents.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, Evelle J. Younger, District Attorney, Harry Wood and Robert J. Lord, Deputy District Attorneys, for Plaintiff and Appellant.

No appearance for Defendants and Respondents.

LILLIE, J.—This is an appeal by the People from an order setting aside an information following a motion by defendants under the provisions of section 995, Penal Code. The information charged Oliver Massengale, Jr., Charles Arthur Massengale and William Theodore Lindo with extortion (Myra Teed) (§ 518, Pen. Code),[1] extortion, attempted extortion and kidnaping Olive Fetherolf (§§ 522, 524,[2] 207, Pen. Code), kidnaping Harriet Ruth Brown (§ 207, Pen. Code), and attempted grand theft (§ 644, Pen. Code). No brief has been filed by respondents after notice duly given by the clerk under rule 17(b), California Rules of Court.

Myra Teed, 70 years old, lived alone. Around 10 a.m. on June 9, 1967, she stepped outside to pick up her trash cans at

[1]Section 518, Penal Code: "Extortion is the obtaining of property from another, with his consent, . . . induced by a wrongful use of force or fear, . . ."

[2]Section 522, Penal Code: "Every person who, by any extortionate means, obtains from another his signature to any paper or instrument, whereby if such signature were freely given, any property would be transferred, or any debt, demand, charge, or right of action created, is punishable in the same manner as if the actual delivery of such debt, demand, charge, or right of action were obtained."

Section 524, Penal Code: "Every person who attempts, by means of any threat, such as is specified in section 519 of this code, to extort money or other property from another is punishable . . . ."

the curb when defendants drove up in a truck. "They began shouting to me that I should have the trees in my back yard trimmed. They should be topped"; they were all "yelling" at the same time. She had a rose bush growing on a trellis and one of them told her it was very dangerous, that it was going to grow into the roof. She testified, "Then they ran down the back yard. They wanted to top a liquidambar that I have down there. They insisted that they trim the liquidambar. I said, 'I don't want anything done. I don't want anything trimmed.' They spied an elm. They wanted to top that. I said, 'I don't want anything done to my trees.' So then they spied the avocados. They wanted to trim those. I said, 'I want you to get off my property. I don't want you here. Get off. I don't want anything done.' They didn't pay any attention to me. It was as if I hadn't said anything. One of them jumped up in a tree, and he had a saw of some kind and he began sawing on the limbs of the avocado. He sawed off one of the limbs. He damaged the avocados. It was loaded with fruit. And I was yelling at them constantly to get off my property. I said, 'You have no business here.' I said, 'I can't afford to pay for all of this.' One of them said, 'Oh, yes. You have plenty of money. We know your kind.' And they were very belligerent, very aggressive and smart alecky."

Off the avocado tree defendants broke a couple of old branches and cut off a limb which was covered with fruit, then one of them declared that they had cut off 15 branches—he counted every branch on the limb. Miss Teed told defendants, "If you don't get off my property I am calling the police." Defendant Lindo said, "Oh, no, you're not. You told us to do this," and she said, "I did not. I told you to get off my property." Then Lindo said, "Well, there are three of us" and he pointed to each one of them, "and one of you." By this time Miss Teed was frightened. Defendants continued to hack away at the limbs, but she went into the house and locked the door; "I began to be afraid, because I thought these men are dangerous. . . . I was afraid, yes." When she went into the house she did not call the police "because they threatened [her]." She watched them out of her window; they hacked up the limb, chopped off some branches and loaded them onto a truck although they left "quite a few." She sat alone in the kitchen "being frightened." Then defendant Lindo came to the back door and presented a bill for $77, telling her it was for 15 limbs at $3.85 a limb and $20 for hauling them away. She "was quite frightened" and paid the bill by check which she made out to Lindo; she paid

defendants the money "because [she] was afraid of them." Shortly after they left "I began to think how foolish I was that I didn't report it immediately, and I then reported it to the police. . . ."

Olive Fetherolf was 85 years old and lived with her sister who was 72. About 12:30 p.m. on June 12, 1967, she saw defendants in her back yard. Defendant Lindo "said that there was a broken branch over the fence that was over a wire of my neighbor's house and that if there was a storm or anything and the branch would hit this wire it would cause a fire and I would be responsible for burning my neighbor's house." She told defendants she could not see a broken branch and that she 'didn't want the tree trimmed."; Lindo said, "I heard you say that, but the tree is going to be trimmed." She told him she did not want it trimmed, but he motioned one of the defendants to climb a Jacaranda tree; then the other climbed up and they started cutting it. They left some of the limbs in the neighbor's yard and sawed up some of the rest and took most of them away. She asked them how much they were going to charge her and they said $5.85 a foot. Then they started trimming a banana tree; there was a clump of them and the one in the center was dead; they said that one should come out. She told them not to take it out; "I said to leave it alone," but they proceeded to take out the banana tree mutilating the others and tramping down the plants in the yard. In two hours Oliver Massengale approached her in the back yard and told her "they wanted a thousand dollars. They first asked for $1170." He said it measured up that much at $5.85 a foot. She told him that she did not have $1,170 but she had it in a savings account. Oliver wanted to know the name of the bank and went into the house where he called it. She talked to the banker who told her she couldn't get the money unless she came in for it. It was near closing time and "Oliver was afraid he wasn't going to get any money, so he had to hurry to go to the bank and he said he would take me to the bank in his truck"; defendants took her and her sister Harriet Ruth Brown in the truck. Asked if she went with them willingly, Mrs. Brown answered "No." Mrs. Fetherolf was asked if she want willingly and she replied "Not very willingly, no." Asked "Did someone tell you you had to go to the bank," she answered, "Sure. How could he get his money if I didn't?" In Oliver's presence she made out her personalized check payable to Oliver Massengale for $1,000 and signed it (Exh. 1). Oliver originally

asked her for $1,170 but told her he would make a very liberal discount of $170. Asked if she was afraid when she made the check out, she answered, "Well, I didn't do it very willingly." Donald Hanover, a tree surgeon doing business for 11 years in the valley, went to Olive Fetherolf's home on June 14, 1967, and observed the work done by defendants; he testified that the charge for the work—for three men and equipment from the valley—and removal of the debris would cost $45.

■ It is contended by the People, and we think correctly so, that the order dismissing the proceedings under section 995, Penal Code, should be reversed. It is apparent that in granting the motion the superior court weighed the evidence and decided the issues which should have been decided at trial. Among other things, the court found that defendants' conduct was "not menacing," characterizing it as nothing more than "super salesmanship," and they made "no threats"; and that the two women, "stupid housewives," instead of telling them to get off their property "let the work proceed," "started telling [defendants] what he [sic] is to do" and when presented a bill put up a "squawk."[3] .

---

[3] "THE COURT: What do you mean, menacing presence? . . . Why was it that these women allowed the work to be done? They were told in each instance, as I recall, that 'Your trees need trimming.' 'Let me trim your trees.'

"And then, albeit perhaps as a result of some super salesmanship, they went about trimming the trees, using their equipment. And then after they had done their work and presented a bill, then the women started putting up a squawk.

"I don't see any extortion in these cases.

". . . . . . . . . . .

"Well, of course it isn't wholesome. But if men come to a householder's home and say, 'We are tree trimmers, and we want to trim your trees,' and she fends them off saying 'I don't want to do it,' or 'I don't want you to do it,' or 'It doesn't need to be done,' or some such thing as that, and then their salesmanship seems to make her yield, and she not only lets them go about doing the job but suggests other things for them to do, then this doesn't look as if it is anything more to me than that they have caused her to surrender her earlier objections to their indications that the job needed to be done.

"Now, thereafter they present her with a bill, and she thinks the bill is too much. I don't hold to the proposition, if that is your argument, that it then becomes criminal because they say, what was it, $77 in one instance for forty to fifty minutes work. I don't think the size of the bill makes the act criminal.

". . . . . . . . . . .

"I don't get from the substance of this testimony that there is criminal conduct. There is some super salesmanship, and there are stupid housewives involved. But this Court being a criminal court, is not here to protect stupid housewives against non-criminal acts. And I can't say that these are criminal acts.

". . . . . . . . . . .

■ On a preliminary hearing the magistrate is required to weigh the evidence and pass on the credibility of witnesses in determining if a crime has been committed and if there is sufficient cause to believe defendant guilty thereof. (§ 872, Pen. Code; *Rogers* v. *Superior Court,* 46 Cal.2d 3, 7-8 [291 P.2d 929].) When a superior court reviews this decision on a motion under section 995, Penal Code, it may not substitute its judgment as to the weight of the evidence for that of the committing magistrate or judge the credibility of witnesses.

■ If there is some evidence to support the information, the court will not inquire into the sufficiency thereof. (*Perry* v. *Superior Court,* 57 Cal.2d 276, 283-286 [19 Cal.Rptr. 1, 368 P.2d 529]; *De Mond* v. *Superior Court,* 57 Cal.2d 340, 345 [19 Cal.Rptr. 313, 368 P.2d 865]; *Badillo* v. *Superior Court,* 46 Cal.2d 269, 271 [294 P.2d 23].) The information will be set aside on the basis of insufficient cause only where there is no evidence that a crime has been committed or there is no evidence to connect defendant with the crime. (*Weber* v. *Superior Court,* 35 Cal.2d 68, 69 [216 P.2d 871]; *People* v. *Upton,* 257 Cal.App.2d 677, 685 [65 Cal.Rptr. 103]; *People* v. *Fitch,* 189 Cal.App.2d 398, 402 [11 Cal.Rptr. 273].)

■ Further, no view of the evidence supports the court's findings that defendants' conduct was not menacing, defendants made no threats, the two women were stupid housewives, instead of telling defendants to get off their property they let the work proceed and then told defendants what to do and when presented a bill put up a ''squawk.'' Three ''yelling,'' ''shouting'' defendants descended on Myra Teed; without her consent they entered upon her property and by bullying tactics proceeded to cut her trees. Contrary to allowing them to do the work and telling them what to do, she repeatedly told defendants she didn't want ''anything trimmed,'' ''anything done to [her] trees,'' ''anything done,'' and ''was yelling at them constantly to get off [her] property''; in fact, when she threatened to call the police to get them off of the premises one told her, ''Oh, no, you're

''I don't see that there were threats made on these people. There was, as I have indicated, super salesmanship. But here was a clear opportunity for each of these persons to say, 'Get off my property. I don't want you to touch anything on my property.' But instead of doing that, they let the work proceed. The work took some time to do, because tree trimming does. They are using apparatus and climb trees and using saws and all the rest of that. And each of these persons, if they did not really want the work done, could have called the coppers and said, 'Get these people off my property.' They didn't do it. They started telling them what he [*sic*] is to do.''

not," and warned her that there were three of them and only one of her. She did not call the police because they "threatened her" and she "was afraid," "thought these men are dangerous." As well as she could Miss Teed resisted defendants' activities; certainly it cannot be said she consented to anything they did. And the fear deliberately engendered in her by defendants' bullying tactics, makes the court's delineation of their conduct as "super salesmanship" to which she surrendered ridiculous. Because she "was quite frightened" and "afraid of them" she paid the $77 bill presented although she thought it "was outrageous." The evidence clearly establishes that the crime of extortion (§ 518, Pen. Code) was committed by defendants.

Particularly vicious was defendants' imposition on 85-year-old Olive Fetherolf, their demand on her for $1,170 and their carting her and her 72-year-old sister off in their truck to the bank. The record shows that both went unwillingly when Oliver told Mrs. Fetherolf she had to go to the bank to get the money. At the outset, Mrs. Fetherolf tried in vain to resist the "work" defendants' foisted upon her. She repeatedly told them "she didn't want the tree trimmed" but Lindo responded that "the tree is going to be trimmed" and motioned Oliver and Charles to climb the Jacaranda tree and cut it. When they started on a banana tree, she told them to "leave it alone," but defendants proceeded to take it out causing damage to the other trees and plants in the yard. There was no evidence that Mrs. Fetherolf allowed the work to be done. The fact is, she was helpless to prevent it. When asked if, after Oliver's demand for $1,170, she was afraid when she signed the check in Oliver's presence for the outrageous bill he presented to her, she testified that she "didn't do it willingly." It may be assumed that had not the police been waiting in the bank due to the thoughtful call by the manager, the check would have been presented and paid.

As to the superior court's observation that there were no "threats made on these people," it is fairly apparent that Miss Teed and Mrs. Fetherolf were not the first persons to have been intimidated and menaced by defendants in this manner. Defendants were well organized, and their equipment and manner of operation show them to be experienced in this kind of activity. An experienced extortionist does not find it necessary to designate specifically what he intends to do as a means of terroriizng his prey. (*People* v. *Goldstein,* 84 Cal. App.2d 581, 586-587 [191 P.2d 102].) The more vague and general his actions and statements the better they will serve his

purpose in magnifying the fear of his victim and the better also it will serve to protect him in the event of the failure to accomplish his extortion and of a prosecution of his attempted crime. (*People* v. *Sanders*, 188 Cal. 744, 749 [207 P. 380]; *People* v. *Bolanos*, 49 Cal.App.2d 308, 312 [121 P.2d 753].) " 'No precise words are necessary to convey a threat. Conduct takes its legal color and quality more or less from the circumstances surrounding it.' (*Bush* v. *State*, 19 Ariz. 195 [168 P. 508, 510]. See also *People* v. *Camodeca*, 52 Cal.2d 142, 148 [338 P.2d 903]; *People* v. *Peppercorn*, 34 Cal.App.2d 603, 606 [94 P.2d 80].)

■ "Threats may consist of a menace of destruction or injury to person or property. ■ No precise or particular form of words is necessary in order to constitute a threat under the circumstances. Threats can be made by innuendo and the circumstances under which the threat is uttered and the relations between [defendants and the two women] may be taken into consideration in making a determination of the question involved." (*People* v. *Oppenheimer*, 209 Cal.App.2d 413, 422 [26 Cal.Rptr. 18].)

■ It is difficult indeed to read the testimony of the three women and impute to defendants anything other than the most vicious intent to intimidate two lone, helpless, elderly women, who did not want their property disturbed, and to thrust upon them their "work" which the women were powerless to prevent, and for which defendants demanded unconscionable sums of money knowing that through fear they would pay. Defendants' belligerence and aggressiveness coupled with Lindo's warning that "there are three of us and one of you," could only convey to a lone 72-year-old woman a threat of force and violence. While defendants touched neither woman and did not precisely say what would happen if the women refused to pay the bills tendered, implicit in the sheer force with which they embarked upon their activities in the face of repeated protests and their unwelcome presence on the premises, is the menace of personal injury if the women refused to pay. Defendants' minacious conduct and outrageous demands viewed in the light of the fact that these women were elderly and lived alone support the fear that induced them to pay, and, in the case of Mrs. Fetherolf and her sister, go with defendants in their truck to the bank. While defendants' activities would not for an instant be tolerated by able-bodied men, would probably even be ridiculed, their belligerent and aggressive conduct was

designed to and did terrify the prey they carefully selected—elderly women living alone. In any event, such determinations may not be reviewed by the superior court in deciding a motion under section 995, Penal Code.

The order is reversed.

Wood, P. J., and Fourt, J., concurred.