Filed 6/20/25  P. v. Nazir CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>REHAN NAZIR,<br><br>    Defendant and Appellant. | B336437<br><br>(Los Angeles County<br>Super. Ct. No.<br>XSEVA151320) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Andrew C. Kim, Judge.  Affirmed with directions.

Okabe and Haushalter, Mark J. Haushalter and Joseph Alexander Weimortz Jr. for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Scott A. Taryle, Supervising Deputy Attorney General, and Blythe J. Leszkay, Deputy Attorney General, for Plaintiff and Respondent.

# INTRODUCTION

Rehan Nazir appeals from the judgment after a jury convicted him of numerous crimes arising from his unlawful activities as a bail agent. Nazir argues substantial evidence did not support his convictions for kidnapping and some of his convictions for false imprisonment and extortion. Nazir also argues the trial court erred in (1) instructing the jury on kidnapping, (2) excluding evidence of a restraining order issued in an unrelated matter against one of Nazir's victims who testified at trial, and (3) denying a motion to compel discovery of information subject to the official information privilege. And citing Penal Code section 1301,[1] which makes it a misdemeanor for a bail agent who arrests a defendant not to timely deliver the defendant to court, Nazir argues he can only be guilty of misdemeanor conduct on his kidnapping convictions. Because these arguments are forfeited, meritless, or both, we affirm his convictions.

Nazir also argues the trial court erred in denying his motion under section 1385 to dismiss two sentence enhancements. Because the trial court applied the wrong legal standard and did not exercise informed discretion in determining whether to dismiss the enhancements, we vacate Nazir's sentence and direct the trial court to reconsider the motion to dismiss in light of *People v. Walker* (2024) 16 Cal.5th 1024 (*Walker*) and to resentence Nazir.

---

[1] Undesignated statutory references are to the Penal Code.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *Police Arrest Nazir for Burglary and Discover Additional Criminal Conduct*

In July 2019 Los Angeles County Sheriff's deputies arrested Nazir for burglary while he sat in an SUV near the home of Jean and David Kwon. Nazir, who at the time was a bail agent (sometimes called a bail bondsman), told the detectives he was there to serve process papers. A deputy searched Nazir's wallet, which included a permit to carry a concealed firearm and business cards identifying him as a bail agent and a narcotics detective with the Torrance Police Department. Nazir told the deputy he left the police department in 2010.

Detectives Anthony Valenzuela and Christopher Gentner investigated the burglary and learned of a criminal report involving Nazir and one of his victims, Matthew Pacheco, whom the deputies interviewed about his relationship with Nazir. Pacheco showed the detectives two videos posted on YouTube involving Nazir and Nickolas Portune (Portune), a friend of Pacheco's. The videos were posted on a YouTube channel operated by a bounty hunter named Demar Hooks, whose wife filmed Hooks and Nazir apprehending bailees and posted the videos to Hooks's YouTube channel. The videos on Hooks's channel included incidents in 2017 and 2018 involving Portune, Pacheco, and Robert Neal. Detectives Valenzuela and Gentner investigated those incidents and Nazir's work as a bail agent and discovered a wide range of criminal activity.

Among that criminal activity was a 2018 incident involving Shannon Van Heyningen. In September of that year Van Heyningen believed Nazir repossessed her truck at the direction

3

of the company that financed its purchase. After learning the company had not sent anyone to repossess the truck, Van Heyningen reported the truck stolen. Van Heyningen later learned where the truck was and reported it to police. Officers arranged to meet Van Heyningen to get her keys, then brought the truck to her in a parking lot. While Van Heyningen was driving the truck home, Nazir called her and said, "'Bitch, I know where you live and I could shoot you from across the street and nobody's going to know the difference.'"

Several days later someone stole the truck again. Van Heyningen did not immediately report the truck stolen because of Nazir's threat. Later that day, a man approached Van Heyningen in front of her house. He handed Van Heyningen five photographs of dead people and said, "'If he was able to murder these people and get away with it, and get this out of an evidence box, what do you think he could do to you and your daughters living here alone?'" About two weeks later Nazir called Van Heyningen and again said he could shoot her. Van Heyningen reported the threats to police, and six months later, after learning Nazir was a former police officer, she reported the truck stolen again. Van Heyningen never recovered her truck.

B. *A Jury Convicts Nazir on Multiple Counts and Finds True Certain Firearm Allegations, and the Trial Court Sentences Him*

The People charged Nazir with 32 counts arising from the incidents involving the Kwons, Portune, Pacheco, Neal, and Van Heyningen. A jury convicted Nazir on 17 counts, including counts 5, 11, and 22 for kidnapping Portune, Pacheco, and Neal

4

(§ 207); counts 7, 14, and 23 for false imprisonment of Portune, Pacheco, and Neal (§ 236); and counts 9, 10, 13, and 24 for committing extortion in connection with the kidnappings of Portune and Pacheco (§ 518). In connection with counts 9, 11, 13, and 14 the jury found true the allegation a principal in the commission of a felony was armed with a firearm (§ 12022, subd. (a)(1)). In connection with count 22 the jury found true the allegation Nazir personally used a firearm in the commission of a felony (§ 12022.53, subd. (b)).

The jury also convicted Nazir on four counts related to the incidents involving Van Heyningen, including count 2 for grand theft of an automobile (§ 487, subd. (d)(1)); count 3 for willfully using force or threatening to use force or violence upon a witness to, or a victim of, a crime or any other person, or to take, damage, or destroy any property of any witness, victim, or any other person, because the witness, victim, or other person has provided assistance or information to a law enforcement officer (§ 140, subd. (a)); count 4 for making a criminal threat (§ 422, subd. (a)); and count 35 for purchasing or receiving a firearm knowing a restraining order, injunction, or protective order prohibited him from doing so (§ 29825, subd. (a)).[2]

The trial court sentenced Nazir to an aggregate prison term of 27 years. On count 22 (kidnapping Neal) the court imposed the lower term of three years, plus 10 years for the firearm

---

[2] The jury also convicted Nazir on count 21 for false imprisonment (§ 236), count 31 for burglary (§ 459), and count 34 for another incident of purchasing or receiving a firearm knowing a restraining order, injunction, or protective order prohibited him from doing so (§ 29825, subd. (a)). Nazir does not challenge those convictions or the convictions on counts 13 and 24 for extortion.

enhancement under section 12022.53, subdivision (b). On count 11 (kidnapping Pacheco) the court imposed the middle term of five years, plus one year for the firearm enhancement under section 12022, subdivision (a)(1). On count 5 (kidnapping Portune) the court imposed the middle term of five years. On count 31 (burglary) the court imposed a term of one year four months (one-third the middle term of four years). On count 3 (making a criminal threat to Van Heyningen) the court imposed a term of one year (one-third the middle term of three years). And on count 2 (grand theft of Van Heyningen's truck) the court imposed a term of eight months (one-third the middle term of two years). The court imposed concurrent sentences on counts 9, 10, 13, 21, 24, 34, and 35, and the court imposed and stayed execution of sentences on counts 4, 7, 14, 23 under section 654. Nazir timely appealed.

## DISCUSSION

A. *Nazir's Challenges to His Kidnapping Convictions Are Forfeited, Meritless, or Both*

1. *Additional Factual Background*

a. *The Role and Authority of Bail Agents*

At the time of the incidents involving Portune, Pacheco, and Neal, Nazir was a bail agent for a company appointed to write bail bonds for Lexington National Insurance Corporation. At trial an official from the California Department of Insurance testified about the bail bonds industry and practices. A manager for Lexington testified about the company's business practices.

The insurance official described a bail bond as an insurance contract between an indemnitor (the bailee or the person assuming the risk), a surety (such as Lexington), and the court.[3] He stated a bail agent like Nazir is licensed to issue a bail bond under a power of attorney from an insurance company. The bail agent generally charges the bailee or indemnitor a premium for the bond. According to the insurance official, insurance companies operating in California cannot charge a bond premium greater than 10 percent of the bail amount.

The insurance official testified a bail agent generally requires the bailee and any indemnitor to fill out an application for bail and to sign a contract containing the terms the bailee must follow to be released on bail. The contract is a standard form approved by the Department of Insurance. The People introduced a copy of the standard form bail contract into evidence. The form contract gives the surety authority to "apprehend, arrest and surrender" the bailee "to the proper officials" if, among other things: (1) the bailee leaves the

_____

[3] "The bail bond transaction is a function of two different contracts between three different parties—namely, (1) a contract between a criminal defendant and a surety under which the surety posts a bail bond in exchange for the defendant's payment of a premium and his [or her] promise to pay the full amount of the bond in the event of his [or her] nonappearance, and (2) a contract between the surety and the People under which the surety act[s] as a guarantor of the defendant's appearance in court under risk of forfeiture of the bond. [Citation.] If the defendant fails to appear, the surety becomes the state's absolute debtor for the full amount of the bond." (*BBBB Bonding Corp. v. Caldwell* (2021) 73 Cal.App.5th 349, 363, internal quotations omitted; see *People v. The North River Ins. Co.* (2020) 48 Cal.App.5th 226, 235.)

jurisdiction or moves from his or her current address without prior consent; (2) the bailee commits an act that "constitutes reasonable evidence of [the bailee's] intention to cause a forfeiture of the [b]ond"; (3) the bailee is arrested and incarcerated for another offense; or (4) there is a material increase in the risk assumed by the surety, for example, where collateral or security given for the bond depreciates in value. Section 5 of the form contract states the bailee agrees the surety and its designees may enter the bailee's residence or other property without notice "for the purpose of locating, arresting, and returning [the bailee] to custody." Under that section, the bailee waives "any and all causes of action," including false imprisonment. Finally, the form contract gives the surety authority to assign and enforce any of its rights under the contract to any of the surety's agents (such as a bail agent) without notice to or consent by the bailee.

If the bailee or indemnitor pays the premium with collateral, he or she must sign an attachment to the contract identifying the collateral. After paying the premium, the Lexington manager said, the bail agent must give the bailee and any indemnitor a receipt and a copy of the contract. After the contract has been signed, the bail agent may not require the bailee to provide collateral for any unpaid premium if the collateral was not part of the original contract.

The insurance official testified the bail bond indicates the date the bailee must appear in court. If the bailee fails to appear, the bond is forfeited, and the insurance company has 180 days to find and surrender the bailee before paying the court the forfeited amount. If the bailee is not found and surrendered, the insurance company can attempt to collect the forfeited bond

8

amount from the bail agent. If the prosecutor decides not to file charges against the bailee, the bond is exonerated. If the bailee or indemnitor still owes the bail agent all or part of the premium when the bond is exonerated or if the agent incurs certain additional expenses, the agent can attempt to recover that amount from the bailee or indemnitor through a civil action. The Lexington manager said Lexington generally sues the bailee to recover any unpaid premium.

The insurance official testified bail agents may not represent themselves as peace officers. A bail agent, however, may arrest a bailee if bail is forfeited or if the bailee increases the underwriting risk by planning to leave the jurisdiction or to commit new crimes. The Lexington manager testified failing to pay a premium is not grounds for arresting and releasing a bailee or arresting and surrendering the bailee to jail. A bail agent similarly cannot arrest a bailee after the bond is exonerated because the bond is no longer in effect. Bail agents generally delegate authority to a fugitive recovery agent, also called a bounty hunter, to arrest a bailee. The Lexington manager said bail agents affiliated with Lexington may not arrest and release a bailee without surrendering the bailee to court.

### b. *Nazir Kidnaps Portune*

Portune and Pacheco were arrested together in June 2017 and taken into custody. Portune arranged for bail through a friend who knew Nazir. The court set Portune's bail at $20,000, which Nazir apparently advanced, and Portune agreed to pay Nazir a $2,000 premium, but he did not sign a bail contract at that time. After his release Portune met Nazir at a hotel where

he paid Nazir $600 toward the premium. Nazir told Portune that he could pay the rest over time.

The next day Portune signed a contract at Nazir's office, but did not receive a copy of it. Shortly after the meeting Portune paid Nazir another $200 and received a credit of $300 for referring a friend to him.

In August 2017 Portune returned to court as ordered and learned the People had not filed any charges against him. Portune informed Nazir his case had been dropped, and Nazir told Portune he still had to pay the balance owed on the premium. Portune acknowledged his debt, but told Nazir he was not able to pay him at that time.

Between August and November 2017 Portune ignored several phone calls from Nazir, but eventually spoke with him. On November 1, 2017 Nazir called Portune and asked him to meet his assistant at a fast food restaurant to sign some "paperwork." Despite thinking the request was a little "odd," Portune agreed to the meeting because he had not paid Nazir in one or two months and wanted to remain on "good terms" with him. Portune and his girlfriend Megan Ritchie drove in Portune's car to the restaurant.

Portune parked in the restaurant's lot next to Nazir's assistant, who was standing behind an SUV. Two other vehicles—a black and white one that "looked like a police vehicle" and a black SUV—parked behind Portune's car, blocking him in. Five people, including Nazir, got out of the cars brandishing guns and yelled at Portune to get out of his car and put his hands up. Portune said Nazir was dressed "like a SWAT officer" and wore a bulletproof vest. Nazir pointed a gun at Portune, while another man later identified as Hooks pointed a gun at Ritchie. The

group also had a large German Shepherd. Portune asked Hooks to put down his weapon because Ritchie "wasn't doing anything wrong," but Hooks "moved in closer with the weapon . . . and just continued to point it at her." Nazir and Hooks pushed Portune up against the black SUV, told him to "cooperate," and handcuffed him behind his back, while he asked what was going on. Portune told Nazir again he had gone to court as ordered and did not understand what was happening. Nazir told Portune in an "extremely aggressive" tone he would take Portune to jail if Portune did not pay him. Someone put Portune in the vehicle that looked like a police car, and Hooks stood outside the car's window. Portune asked Hooks why the men were detaining him, and Hooks said it was because Portune "need[ed] to go to [his] court dates." Portune told Hooks and another man that he went to his court date and that they "can't be doing what they're doing," but the men laughed at him.

Hooks drove Portune to Nazir's office, which was approximately 15 minutes away, while Portune remained handcuffed. Ritchie was not with Portune, and Portune did not know where she was. At Nazir's office someone placed Portune in a chair, still in handcuffs, and Portune continued to protest his detention, yelling at Nazir and complaining Nazir "was taking things way too far." Nazir told Portune that he had not "paid in full" or returned his phone calls and that Nazir would take him to jail if he did not pay "the rest of the money." Portune told Nazir he had no authority to take him to jail because his case had been dropped. Eventually Portune offered Nazir a "small amount of money," but Nazir said he would keep Portune's car until he paid the entire remaining balance. Nazir told Portune that Ritchie was going to an ATM to withdraw money for Portune's release.

11

Nazir held Portune in handcuffs for two hours before Ritchie was brought to Nazir's office. At some point after Ritchie arrived, she gave Nazir the money she withdrew from the ATM, and someone removed the handcuffs from Portune.

Nazir told Portune he owed more than the $400 remaining balance on the premium because Portune had to pay the cost of the bounty hunters used to detain him. Nazir told Portune he would take him to jail and keep his car (which someone had driven to Nazir's office) until Portune paid the full amount. Portune called his mother and arranged for her to pay Nazir the next morning. Nazir allowed Portune and Ritchie to leave, but Nazir kept Portune's car. Portune did not sign any documents that evening or receive a receipt for the money Ritchie paid Nazir or for his car as collateral.

At trial the People played the video of Portune's kidnapping Hooks's wife filmed and posted on YouTube. The Lexington manager testified that Portune's bond was never forfeited and that Lexington never asked or authorized Nazir to apprehend Portune.

c.     *Nazir Kidnaps Pacheco*

As stated, Pacheco was arrested with Portune in June 2017. Portune arranged for Nazir to post bail for Pacheco, but Pacheco did not believe he ever signed a bail contract. Pacheco did not know the amount of the bond or his premium or how to pay Nazir. Pacheco never made any payments to Nazir and, as in Portune's case, the People did not file charges against Pacheco after his arrest.

In November 2017 Pacheco lived with Sara Simpkins in a garage adjacent to a house. On the evening of November 2, 2017

12

Pacheco and Simpkins were about to watch television when Simpkins saw on surveillance cameras "a bunch of guys" "coming toward [them] with guns." The men banged on the garage door. Simpkins and Pacheco were "scared" and "freaked out," and Simpkins asked Pacheco to open the door. When the door opened, two men came inside brandishing guns, followed by Nazir, who did not have a gun. Someone put Pacheco in handcuffs and took him out of the garage. Pacheco testified that he did not want to go with the men and was "worried," but that he "wasn't kidnapped or . . . anything all weird like that." Simpkins said she was scared, did not feel free to leave, and was also briefly handcuffed. Nazir spoke to Pacheco for approximately 20 minutes and demanded over $2,000.

Pacheco asked Simpkins to give Nazir some money, and to keep Nazir from taking Pacheco to jail, she gave Nazir $400 she had in her pocket. Nazir then took Pacheco to his office. Pacheco called Simpkins from Nazir's office and asked her to go there. Simpkins drove to Nazir's office in a rental truck containing room dividers Pacheco had stolen. Nazir agreed to take the room dividers in lieu of cash and released Pacheco. Pacheco said the only reason he gave Nazir the room dividers was to be "free."

At trial the People played the video of this incident Hooks's wife filmed and posted on YouTube. The Lexington manager testified that Pacheco's bond was never forfeited and that Lexington never requested or authorized Nazir to apprehend Pacheco.

### d. *Nazir Kidnaps Neal*

Neal was arrested on January 6, 2018, and a friend arranged with another friend to post his bail. Nazir arrived at

the jail to post Neal's bond. The court ordered Neal to return on April 10, 2018 and set his bail at $75,000; Nazir charged Neal a premium of $7,500. Neal did not remember signing a bail contract, but he gave Nazir $600. Nazir asked Neal when he could pay the balance, and Neal asked for "'a couple of days.'" Nazir left Neal at the hotel where he was living.

Nazir called Neal the next day to ask for another payment, and Neal told him that he had not "forgotten" and that he would call Nazir later. Soon after the first call, Nazir called Neal again asking when they could meet. Neal asked for more time to get the money, and Nazir told him he would take him to jail if he did not pay.

A few days later Neal was in a different hotel room with a friend when someone knocked on the door. Neal's friend opened the door, and Nazir rushed inside the room, yelled "'get down on the floor,'" and pointed a gun at Neal. Nazir was wearing a bulletproof vest and "looked like somebody [who] stepped out of . . . a war or something." Neal got down on the ground with Nazir "standing over [him] with a gun pointed at [his] head." Neal was scared. Nazir said that he needed his money and that Neal was going to jail. Neal tried to put his hands up, but Nazir sat on him with the gun still pointed at his head. Neal told Nazir he would get him some money and asked him to get off him and put the gun away.

Nazir put Neal in handcuffs, took money from his pockets, walked him to a car, and placed him in the backseat. Neal said that he did not go with Nazir willingly and that he had no choice because he was handcuffed. Nazir drove Neal to Nazir's office, which was approximately 20 minutes away. During the drive Neal pleaded with Nazir to let him make some phone calls to try

14

to get some money, but Nazir said he was angry and took the matter personally because Neal let his phone calls go to voicemail.  Nazir told Neal that he had his "freedom" in his hands and could "put extra charges" for burglary and identity theft "on [him]."

At Nazir's office Nazir handcuffed Neal to a chair.  Several other people were there, including Hooks, his wife, another associate of Nazir's, and Neal's friend from the hotel (it is unclear how she got there).  Nazir had a gun; Hooks's wife livestreamed the event for "fans" of Hooks's YouTube channel.  Nazir and the others questioned Neal for about an hour and a half.  Neal eventually said he could get some money if Nazir took him to his hotel room.  Nazir and Hooks drove Neal to his hotel, still handcuffed.  At the hotel Hooks had to go to the front desk to get a new key card to access his room.  Nazir removed the handcuffs to allow Neal to go to the front desk without causing a "scene," but Nazir and Hooks accompanied Neal.  Neal said he was "scared" because he knew Nazir was armed, so he tried to follow Nazir's instructions to "be cooperative."  Nazir or Hooks told Neal, "'We're not letting you go until we get some money from you.  So don't go [to the front desk] and say something to the clerk like, "Hey, I've been kidnapped by this guy."'"

In his hotel room Neal gave Nazir several credit cards he made using names and credit card numbers Neal bought online.  Neal told Nazir the cards would cover the amount he owed Nazir.  Nazir took the cards, said he would take them "'for now,'" and brought Neal back to the front of the hotel, where Nazir removed the handcuffs.  Nazir told Neal that he still owed Nazir money and could go to jail until he paid.

Several weeks later, after additional communications between Nazir and Neal, Neal decided to move to Florida and missed his court date on April 10, 2018.  The court declared his bond forfeited, but the charges against Neal were later dismissed, and the bond was exonerated on June 15, 2018.

At trial the People played the video of the incident Hooks had posted on his YouTube channel.  The Lexington manager testified Lexington never requested or authorized Nazir to apprehend Neal before April 10, 2018 when Neal's bond was forfeited.

>### 2.   *Substantial Evidence Supported the Kidnapping Convictions*

>### a.   *Applicable Law and Standard of Review*

"Section 207, subdivision (a) defines the crime of simple kidnapping.  [Citation.]  It provides, in relevant part, that '[e]very person who forcibly, or by any other means of instilling fear, steals or takes, or holds, detains, or arrests any person in this state, and carries the person . . . into another part of the same county, is guilty of kidnapping.'  [Citation.]  To prove simple kidnapping, the prosecution must establish 'that (1) the defendant took, held, or detained another person by using force or by instilling reasonable fear; (2) using that force or fear, the defendant moved the other person, or made the other person move a substantial distance; and (3) the other person did not consent to the movement.'"  (*People v. Ellis* (2025) 108 Cal.App.5th 590, 597; see *People v. Hin* (2025) 17 Cal.5th 401, 469.)

16

To constitute kidnapping under section 207, subdivision (a), "the victim's movement must be accomplished by force or any other means of instilling fear. . . . [T]he force used against the victim 'need not be physical. The movement is forcible where it is accomplished through the giving of orders which the victim feels compelled to obey because he or she fears harm or injury from the accused and such apprehension is not unreasonable under the circumstances.'" (*People v. Majors* (2004) 33 Cal.4th 321, 326-327.) "Moreover, asportation accomplished by threat of arrest 'carries with it the threat that one's compliance, if not otherwise forthcoming, will be physically forced.' [Citation.] Thus, the threat of arrest carries with it an implicit use of force necessary for a kidnapping conviction." (*People v. Alvarez* (2016) 246 Cal.App.4th 989, 1002; see *Majors*, at pp. 326-327, 331.)

The "concepts of consent and force or fear 'are clearly intertwined.'" (See *People v. Majors*, *supra*, 33 Cal.4th at p. 327.) "[C]onsent must be an exercise of 'a free will.' Thus, . . . a person who consents must exhibit some 'positive cooperation in act or attitude.'" (*People v. Sattiewhite* (2014) 59 Cal.4th 446, 476, italics omitted.) "A person who is conscious and able to make a choice can express consent merely by being cooperative in attitude," but if a person "exhibited no positive cooperation *even in attitude,* then, despite [his or] her passivity, [he or] she was not consenting. Kidnapping does not require that the victim express some form of protest or resistance." (*Id.* at pp. 476-477; see *People v. Alvarez*, *supra*, 246 Cal.App.4th at p. 1002 ["where a victim consents to the movement, meaning he or she exercises his or her free will in the absence of threats, force, or duress, there is no kidnapping"].) In addition, "even where a victim's initial cooperation is obtained without force or fear, a kidnapping occurs

17

if the accused subsequently compels the victim to accompany him." (*Alvarez*, at p. 1002; see *People v. Hovarter* (2008) 44 Cal.4th 983, 1017 [where the victim voluntarily accepts a ride with the defendant, consent is vitiated when the defendant does not let the victim out of the car].)

"When reviewing a challenge to the sufficiency of the evidence, we ask whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  [Citation.]  Because the sufficiency of the evidence is ultimately a legal question, we must examine the record independently for substantial evidence—that is, evidence which is reasonable, credible, and of solid value that would support a finding beyond a reasonable doubt.  [Citation.]  In doing so, we view the evidence in the light most favorable to the jury verdict and presume the existence of every fact that the jury could reasonably have deduced from that evidence.  [Citation.]  We must also accept logical inferences that the jury might have drawn from the circumstantial evidence.  [Citation.]  We do not question the credibility of a witness's testimony, so long as it is not inherently improbable, nor do we reconsider the weight to be given any particular item of evidence." (*People v. Navarro* (2021) 12 Cal.5th 285, 302, internal quotations omitted; see *People v. Collins* (2025) 17 Cal.5th 293, 307.)

> b.     *Nazir's Victims Did Not Consent to Their Detentions by Signing Form Bail Contracts*

Nazir argues substantial evidence did not support his kidnapping convictions because Portune, Pacheco, and Neal

18

consented to their detentions under the terms of the bail contracts they signed. Neither the People nor Nazir introduced evidence of the terms of any contracts the victims actually signed (if any), but Nazir argued each victim signed a form bail contract. Counsel for Nazir reviewed the terms of the form contract in his closing argument and urged the jury to find that, by agreeing to the contract, Portune, Pacheco, and Neal consented to their arrests. The jury rejected that argument.

Nazir argues Portune, Pacheco, and Neal consented to their detentions under section 3 of the form bail contract, which gives the surety authority to arrest a bailee who commits an act that "constitutes reasonable evidence of [the bailee's] intention to cause a forfeiture of the [b]ond." Regarding Portune, Nazir argues Portune committed such an act by failing to return Nazir's phone calls and by owing Nazir money for the bond premium. But even if Portune signed the form bail contract, and even if Portune's conduct suggested he was a flight risk, Portune testified he told Nazir before Nazir kidnapped him (and multiple times during the kidnapping) that he had returned to court and learned the prosecutor did not file any charges against him. Thus, there was no court date for Portune to miss, and no possibility of forfeiture to justify Portune's detention. The testimony by the Lexington manager that Portune's bond was never forfeited corroborated Portune's testimony. To the extent Portune owed Nazir money for the premium, neither the form bail contract nor California law authorized Nazir to "apprehend, arrest, and surrender" Portune (not to mention that Nazir never arrested or surrendered Portune). Indeed, section 1299.01 defines a "bail fugitive" subject to apprehension as a defendant who "has had [a] bond declared forfeited" or "has violated a bond

condition whereby apprehension and reincarceration are permitted." (*Id.*, subd. (a)(1).) As discussed, neither description applied to Portune.

Regarding Pacheco and Neal, Nazir does not identify any provision of the form bail contract or condition of their release they violated that would constitute consent for their respective detentions. Nazir argues only that Pacheco "did not view himself as being 'kidnapped.'" Whether Pacheco believed he was kidnapped, however, does not determine whether substantial evidence supported the jury's finding he was. In general, "'[a] witness may not express an opinion on a defendant's guilt. [Citations.] The reason for this rule is not because guilt is the ultimate issue of fact for the jury, as opinion testimony often goes to the ultimate issue. [Citations.] "Rather, opinions on guilt or innocence are inadmissible because they are of no assistance to the trier of fact. To put it another way, the trier of fact is as competent as the witness to weigh the evidence and draw a conclusion on the issue of guilt."'" (*People v. Vang* (2011) 52 Cal.4th 1038, 1048; see *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 77; see also *People v. Posey* (2004) 32 Cal.4th 193, 207 ["questions of fact relating to the substantive issue of guilt or innocence are within the province of the jury"].)

Nazir also argues Pacheco's "decision" to go with Nazir and Hooks, "even though he may not have wanted to," did not constitute movement induced by force or fear. Pacheco and Simpkins testified, however, two armed men and Nazir burst into the garage where they lived, put Pacheco and Simpkins in handcuffs, and drove Pacheco to Nazir's office. Pacheco said that he was concerned and did not want to go with the men and that the only reason he gave Nazir the stolen room dividers was to

20

secure his freedom. Substantial evidence supported the jury's finding Pacheco did not exercise "free will" in going with Nazir to his office. (See *People v. Alvarez*, *supra*, 246 Cal.App.4th at p. 1002 [free will exists "in the absence of threats, force, or duress"]; see also *People v. Sattiewhite*, *supra*, 59 Cal.4th at p. 476 ["consent must be an exercise of 'a free will'"].)[4]

        3.      *Nazir's Argument the Trial Court Erred in Instructing the Jury the Victims Could Withdraw Their Consent Is Forfeited and Meritless, and Any Error Was Harmless*

The trial court instructed the jury on kidnapping with CALCRIM No. 1215. That instruction provides, in bracketed language the court decided to give, a kidnapping victim's "[c]onsent may be withdrawn if, at first, a person agreed to go with the defendant. That consent ended if a person changed his or her mind and no longer freely and voluntarily agreed to go with or be moved by the defendant. The defendant is guilty of kidnapping if, after the other person withdrew consent, the defendant committed the crime as [the court has] defined it."

---

[4] Nazir argues substantial evidence did not support his convictions for false imprisonment for the same reasons it did not support his convictions for kidnapping. Because false imprisonment is a lesser included offense of kidnapping, and substantial evidence supported his convictions for kidnapping, substantial evidence supported his convictions for false imprisonment. (See *People v. Salazar* (2023) 15 Cal.5th 416, 420; *People v. Ellis*, *supra*, 108 Cal.App.5th at p. 601; see also *People v. Delacerda* (2015) 236 Cal.App.4th 282, 289 ["'the crime of false imprisonment is necessarily included in the crime of kidnapping'"].)

21

Counsel for Nazir agreed to this instruction. After the court stated it intended to give CALCRIM No. 1215 with the bracketed language, counsel for Nazir stated, "That's fine, because then we just go back to the contract, which is what I'm basing [the victims' consent] on." The court stated, "I understand the argument. That's why I'm giving the instruction."

Nazir argues the trial court erred in giving the bracketed language regarding a victim's ability to withdraw consent, though he does not argue the instruction misstates the law in most cases. Instead, he contends consent in a "bail matter" cannot be withdrawn. Nazir, however, forfeited this argument by failing to object at trial to the instruction as given, and in fact by agreeing the court could give it. (See *People v. Canales* (2024) 106 Cal.App.5th 1230, 1258; *People v. Johnson* (2022) 79 Cal.App.5th 1093, 1113.)

Forfeiture aside, Nazir cites no authority for his assertion a form bail contract makes a kidnapping victim's initial consent "non-revocable." Nazir points to the "California Bail Reform Act, Penal Code section 1268, *et seq.*," but there is no such law in effect by that name, and section 1268 states in its entirety: "Admission to bail is the order of a competent Court or magistrate that the defendant be discharged from actual custody upon bail." Moreover, Nazir's argument depends on him having had authority under a bail contract to detain Portune, Pacheco, and Neal. But Nazir had no such authority because (even assuming each victim signed a form bail contract) none of them had his bond forfeited or took any other action that would give Nazir a reasonable belief his bond would be forfeited. Even a police officer making a lawful arrest may be convicted of kidnapping if the officer's actions are not for legitimate law

22

enforcement purposes and the arrestee does not consent to his or her detention. (See *People v. Alvarez*, *supra*, 246 Cal.App.4th at p. 1003 ["while an officer is transporting someone pursuant to a lawful arrest, he is not kidnapping the arrested person; however, once the transportation is no longer for lawful law enforcement objectives, it may transmute into a kidnapping"].)

Finally, any error in giving the bracketed language in CALCRIM No. 1215 was harmless. Nazir and the People agree giving an instruction that correctly states the law, but has no application to the facts of the case, is an error of state law subject to prejudice under *People v. Watson* (1956) 46 Cal.2d 818, 836. (See *People v. Guiton* (1993) 4 Cal.4th 1116, 1129-1130.) Thus, reversal is required only if it is reasonably probable the result would have been more favorable to Nazir had the error not occurred. (See *Guiton*, at p. 1130.) There is no reasonable probability the result would have been more favorable to Nazir had the court not given the bracketed language in CALCRIM No. 1215 because Nazir did not argue Portune, Pacheco, or Neal initially consented to go with him and then changed his mind. Instead, Nazir argued that the form bail contract included consent to be detained and that the basis for such consent never changed (and, according to Nazir, could not change). Because the jury rejected that argument, the bracketed language in the instruction stating a victim can withdraw consent did not affect the verdict.

4.      *Section 1301 Does Not Preclude Nazir's Conviction for Kidnapping*

Under section 1300 "a bonding company has the statutory right to surrender its bond at any time to return a defendant to

23

the court's custody." (*Indiana Lumbermens Mutual Ins. Co. v. Alexander* (2008) 167 Cal.App.4th 1544, 1547.) Thus, the statute allows a surety to arrest and surrender the defendant (or authorize an agent to do so) before any forfeiture, to allow the court to relieve the surety of its obligation under the bond. Section 1300, subdivision (b), provides that, where "good cause does not exist for the surrender of a defendant who has not failed to appear or has not violated any order of the court," the court has discretion "to order the bonding company to refund the defendant's premium." (*Indiana Lumbermens Mutual Ins. Co.*, at p. 1547.)

The legislative purpose behind the "good cause" limitation "was to temper a bonding company's virtually unlimited power, which power is based on the venerable notion that its dominion over the defendant merely continues the original imprisonment and therefore permits the bonding company to surrender a defendant into custody and terminate liability at any time before forfeiture." (*Kiperman v. Klenshetyn* (2005) 133 Cal.App.4th 934, 939, italics omitted; see *Indiana Lumbermens Mutual Ins. Co. v. Alexander*, *supra*, 167 Cal.App.4th at p. 1547.) Examples of "good cause" include losing contact with the defendant, coupled with a new $1 million warrant in a new case, and the defendant's apparent attempt to flee the state (*Kiperman*, at p. 940); the defendant's failure to appear in court (*People v. Smith* (1986) 182 Cal.App.3d 1212, 1219); and the defendant's disappearance without providing any forwarding address or phone number (*id.* at p. 1221).

Section 1301 prescribes the procedure the surety or its authorized agent must follow to surrender the defendant under section 1300. Among other things, section 1301 permits the

surety to delegate its authority to arrest and surrender a defendant to another person in writing by endorsing "a certified copy of the undertaking or a certified copy of the certificate of deposit." (§ 1301, 1st par.) Section 1301 also provides: "Any . . . person who so arrests a defendant in this state shall, without unnecessary delay, and, in any event, within 48 hours of the arrest, deliver the defendant to the court or magistrate before whom the defendant is required to appear or to the custody of the sheriff or police for confinement in the appropriate jail in the county or city in which defendant is required to appear." (*Id.*, 2d par.) A person who arrests a defendant on bail and "willfully fails to deliver [the] defendant to the court, magistrate, sheriff, or police as required by" section 1301 is guilty of a misdemeanor. (§ 1301, 3d par.)

Nazir argues section 1301 authorizes, at most, a misdemeanor conviction when the bail agent fails to surrender the defendant within 48 hours of the defendant's detention unless, according to Nazir, "there is additional criminal conduct or aggravating factors such as intent to obstruct justice." Nazir's argument fails. First, there is no evidence Nazir attempted to lawfully arrest Portune, Pacheco, or Neal under section 1300, and he did not have authority from Lexington to surrender any of the three men. Second, there were "additional criminal conduct" and "aggravating factors," including extortion and unlawful possession of a gun unrelated to any attempt to surrender the men to authorities. Finally, neither the language of section 1301 nor any authority cited by Nazir supports his assertion a bail agent purporting to act under section 1301 cannot be liable for kidnapping. Nazir did not have "good cause" to arrest and surrender Portune, Pacheco, or Neal, and even if he had initially

intended to surrender them (an intent belied by overwhelming evidence), such an intent would not absolve him of criminal liability for kidnapping. (*People v. Alvarez*, *supra*, 246 Cal.App.4th at p. 1004; see *id.* at p. 1003 [once a police officer "is no longer acting to effectuate a legal arrest, the protection from criminal liability otherwise afforded is lost"]; see also *People v. Rodriguez* (1986) 42 Cal.3d 1005, 1017 ["While defendants may have had a lawful motive ultimately in mind, namely, recovery of [one of the defendant's] property, their conduct in moving [the victim] at gunpoint and against his will in pursuit of that objective still constituted [kidnapping]."].)

### B.      *Substantial Evidence Supported Nazir's Convictions for Extorting Ritchie and Linda Portune*

#### 1.      *Additional Factual Background*

##### a.      *Nazir Extorts Ritchie*

As discussed, during Portune's kidnapping Ritchie withdrew money from an ATM, which she eventually gave to Nazir. Ritchie testified Nazir first asked her for money in the parking lot where Portune had agreed to meet Nazir. She said that she was "scared" because she had "a gun pointed at [her] head," but that she told Nazir she could go to an ATM to withdraw money. Ritchie also said that she knew Portune owed Nazir money and that she believed that, if Portune did not pay him, Nazir would take Portune to jail. Ritchie said that when she agreed to go to an ATM she did not want to "upset anybody." She also said she was "nervous" and did not feel she was free to leave because she did not want to abandon Portune with Nazir.

26

Ritchie stated that at Nazir's office Portune was upset and handcuffed and that she was still "scared," "in shock," and did not "feel completely safe." Portune told Ritchie not to give Nazir any money, but she gave it to him anyway because she believed Nazir would take Portune to jail if she did not. After Ritchie gave Nazir the money she withdrew from two ATMs (because the first one "only allow[ed] [her] to overdraft a certain amount at a time"), Nazir said he would keep Portune's car unless Portune paid him more. Portune called his mother, Linda Portune, who agreed to go to Nazir's office the next morning to pay him. After that, Nazir allowed Portune and Ritchie to leave, but he kept Portune's car.

b. *Nazir Extorts Linda Portune*

The morning after Nazir detained Portune and his car, Portune and his mother Linda returned to Nazir's office. Linda said two other women, another man, and Ritchie were also there. Linda noticed Nazir had a gun on his hip. She asked Nazir for "paperwork," which Nazir did not have. Nazir and Portune "filled out" a form bail bond contract (and possibly other documents) while Linda waited. Linda also asked Nazir why he was holding Portune's car when Portune had paid Nazir. She said Nazir "didn't have really a good reason why he had the car," except that he "could do that." Linda was "uncomfortable" in the office because she "did not like the way things were handled," which "seemed real shady."

Nazir acknowledged Portune's case had been dismissed, but told Portune that he "still had friends" in the Torrance Police Department and that he would have them "come get" Portune if he did not pay him the full amount owed for the premium. Nazir

27

even identified one of the officers by name. Linda paid Nazir $600 or $700 and agreed to go back the next day to pay him another $900. Nazir took Linda and Portune outside where Portune's car was locked behind gates. Nazir gave Portune the keys and let him take his car. That morning or the next day when Linda returned to Nazir's office, Nazir gave Linda three receipts for payments totaling $1,845.

2.    *Substantial Evidence Supported Nazir's Convictions for Extorting Ritchie and Linda*

"Extortion is the obtaining of property or other consideration from another, with his or her consent, . . . induced by a wrongful use of force or fear . . . ." (§ 518; see *People v. Bollaert* (2016) 248 Cal.App.4th 699, 725.) Fear, for purposes of extortion, may be induced by a threat to "do an unlawful injury to the person or property of the individual threatened or of a third person." (§ 519.) And "the requisite 'consent' is not true consent but rather the coerced compliance with a demand induced by the perpetrator's threat." (*People v. Mendoza* (2022) 74 Cal.App.5th 843, 851; see *People v. Goodman* (1958) 159 Cal.App.2d 54, 61.) "'In order to establish extortion, "the wrongful use of force or fear must be the operating or controlling cause compelling the victim's consent to surrender the thing to the extortionist."'" (*Bollaert*, at p. 725; see *Chan v. Lund* (2010) 188 Cal.App.4th 1159, 1171.)

Nazir argues the "necessary element of fear was absent" to convict him for extorting Ritchie and Linda[5] because they paid Nazir "to secure the release of [Portune], not by any wrongful threat or coercion." Substantial evidence, however, supported

---

[5]    Nazir does not appeal from his convictions for extorting Pacheco and Neal (counts 13 and 24).

Nazir's convictions for extorting Ritchie and Linda (counts 9 and 10).  (See *People v. Mendoza, supra*, 74 Cal.App.5th at p. 850.)

Regarding Ritchie, Nazir argues she testified she was not afraid of Nazir and did not pay him out of fear or coercion.  This argument fails too.  First, fear of the perpetrator is not an element of the crime of extortion; rather, the victim must act on the perpetrator's threat to cause a person or property injury.  (See *People v. Bollaert, supra*, 248 Cal.App.4th at p. 726 ["[e]xtortion is a specific intent crime, and thus guilt depends on the intent of the person who makes the threat and not the effect the threat has on the victim"]; *People v. Umana* (2006) 138 Cal.App.4th 625, 641 [same].)  Second, Ritchie did not testify she was not afraid of Nazir.  When asked whether she paid Nazir because she was generally "afraid" or to ensure Portune's release, she answered the latter.  But she followed up by saying that, although "no one forced [her] to go to the ATM, . . . 10 minutes prior [she] had a gun pointed at [her] so . . . ."  The jury could infer from that statement Ritchie was fearful when she took money from her account to pay Nazir.  (See *People v. Mendoza, supra*, 74 Cal.App.5th at p. 851 [consent required to prove extortion "is not actual consent but coerced capitulation" that "prompt[s] compliance"].)  The evidence also showed Ritchie paid Nazir because Nazir threatened to injure Portune by brandishing a weapon, handcuffing him, detaining him, and threatening to take him to jail.  Absent these threats to harm Portune, Ritchie would not have paid Nazir.  That's extortion.  (See *Mendoza*, at p. 853 [making a threat intended to cause a person to pay money without actually resorting to violence is extortion]; *People v. Massengale* (1968) 261 Cal.App.2d 758, 765 [substantial evidence supported the jury's finding of extortion where, "implicit in the

sheer force with which [the defendants] embarked upon their activities in the face of repeated protests and their unwelcome presence . . . , [was] the menace of personal injury if the [victims] refused to pay"].)

Regarding Linda, Nazir argues she paid him to get Portune's car back, not because she was "threatened with force" or "compelled by fear." He also argues there was no evidence that Nazir "directly threatened" Linda or that her payment was coerced. Extortion, however, does not require a "direct" threat. Indeed, "'"[n]o precise words are necessary to convey a threat. Conduct takes its legal color and quality more or less from the circumstances surrounding it."'" (*People v. Massengale*, *supra*, 261 Cal.App.2d at p. 765; see *People v. Bollaert*, *supra*, 248 Cal.App.4th at p. 726 [extortion occurs where a threat to a person or property is "inherent" or "implied"]; *Stenehjem v. Sareen* (2014) 226 Cal.App.4th 1405, 1424 ["'[t]hreats can be made by innuendo and the circumstances under which the threat is uttered and the relations between [the defendant] and the [target of the threats] may be taken into consideration'"].)

Moreover, substantial evidence supported the jury's finding Linda paid Nazir to keep him from taking Portune to jail and from continuing to possess Portune's car. Nazir told Portune in Linda's presence Nazir had friends at the Torrance Police Department who would "come get" Portune if Portune did not pay him; Nazir also insisted he could keep Portune's car. Absent such (not so implied) threats to harm Portune and keep his car, Linda would not have paid Nazir. Again, that's extortion. (See *People v. Bollaert*, *supra*, 248 Cal.App.4th at p. 726 [victims could infer that, if they did not pay the defendant, offensive content about them would remain on the Internet]; *People v. Umana*, *supra*,

138 Cal.App.4th at p. 641 [jury could reasonably conclude, based on the totality of the circumstances, the defendant's letter was intended as a threat to pursue civil and criminal liability against the recipient with the specific intent to extort money].)

C. *Nazir's Argument the Trial Court Erred in Excluding Evidence of a Restraining Order Against Van Heyningen Is Forfeited and Meritless, and Any Error Was Harmless*

1. *Additional Factual Background*

Van Heyningen's late husband, James Jimenez, originally purchased (in 2012) the truck Nazir stole from Van Heyningen. Van Heyningen initiated divorce proceedings against Jimenez in 2014. Jimenez died in 2018.

To impeach Van Heyningen's testimony Nazir sought to introduce evidence Jimenez obtained a restraining order against Van Heyningen in 2009. According to counsel for Nazir, Jimenez alleged in his application for the restraining order Van Heyningen repeatedly drove past Jimenez's place of work on her motorcycle, revved the engine, and made obscene hand gestures. Jimenez also alleged Van Heyningen stole from his truck (which was the same make and model, but different year, as the truck Nazir stole nine years later), was "under investigation" for grand theft and arson of that truck, and went to Jimenez's residence to harass him. The People argued the restraining order was not relevant to Nazir's theft of the truck Jimenez bought in 2012. Counsel for Nazir argued the restraining order was relevant to Van Heyningen's credibility and to whether Van Heyningen was the rightful owner of the

31

2012 truck.  The trial court excluded evidence of the restraining order, ruling it was inadmissible under Evidence Code section 352, but the court allowed counsel for Nazir to question Van Heyningen, without referring to the restraining order, about her ownership of the stolen truck.

Following continued discussion about Van Heyningen's criminal history, counsel for Nazir argued Van Heyningen might say something during her direct examination to make the restraining order relevant.  The court agreed to reconsider its ruling excluding the restraining order after Van Heyningen testified on direct examination.  The court also ruled Van Heyningen did not have any prior convictions that counsel for Nazir could use to impeach her testimony.  After Van Heyningen testified, counsel for Nazir did not renew his request to introduce evidence of the restraining order.

### 2.    *Applicable Law and Standard of Review*

"Evidence Code section 352 provides that a 'court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.'" (*People v. Hin*, *supra*, 17 Cal.5th at p. 476.)  "A witness may be impeached with any prior conduct involving moral turpitude whether or not it resulted in a felony conviction, subject to the trial court's exercise of discretion under Evidence Code section 352." (*People v. Clark* (2011) 52 Cal.4th 856, 931; see *People v. Turner* (2017) 13 Cal.App.5th 397, 408.)  When determining whether to admit a prior conviction (as opposed to other misconduct) for impeachment purposes, "the

court should consider, among other factors, whether it reflects on the witness's honesty or veracity [and] whether it is near or remote in time." (*Clark*, at p. 931.) "Additional considerations apply when the proffered impeachment evidence is misconduct other than a prior conviction. This is because such misconduct generally is less probative of immoral character or dishonesty and may involve problems involving proof, unfair surprise, and the evaluation of moral turpitude. . . . As we have advised, 'courts may and should consider with particular care whether the admission of such evidence might involve undue time, confusion, or prejudice which outweighs its probative value.'" (*Id.*, at pp. 931-932; see *People v. Leonard* (2014) 228 Cal.App.4th 465, 497 [courts deciding whether to admit a misdemeanor offense to impeach a witness who is not the defendant should consider whether the conviction reflects on honesty and is near in time].)

"Because the court's discretion to admit or exclude impeachment evidence 'is as broad as necessary to deal with the great variety of factual situations in which the issue arises' [citation], a reviewing court ordinarily will uphold the trial court's exercise of discretion." (*People v. Clark*, *supra*, 52 Cal.4th at p. 932; see *People v. Hin*, *supra*, 17 Cal.5th at p. 476 ["[w]e review rulings on the admissibility of evidence for abuse of discretion"].) Where a trial court erroneously excludes impeachment evidence, the error is harmless unless it is reasonably probable the result would have been more favorable to the defendant had the trial court not erred. (See *People v. Brooks* (2017) 3 Cal.5th 1, 52 [applying *Watson* to determine whether the erroneous exclusion of impeachment evidence under Evidence Code section 352 was prejudicial]; *People v. Bingham* (2023) 95 Cal.App.5th 1072, 1080 [same].)

33

### 3. *Nazir's Argument Is Forfeited and Meritless, and Any Error Was Harmless*

Nazir argues the trial court abused its discretion in excluding evidence of the restraining order against Van Heyningen because "[c]haracter evidence concerning truthfulness is particularly relevant in assessing witness credibility." Nazir forfeited this argument by failing to renew his request to impeach Van Heyningen with the restraining order after her direct examination. (See *People v. Holloway* (2004) 33 Cal.4th 96, 133 ["'"'Where the court rejects evidence temporarily or withholds a decision as to its admissibility, the party desiring to introduce the evidence should renew his offer, or call the court's attention to the fact that a definite decision is desired.'"'"]; *People v. Smith* (2021) 70 Cal.App.5th 298, 307 [same]; see also *People v. Lightsey* (2012) 54 Cal.4th 668, 713 [defendant forfeited the argument the trial court abused its discretion in excluding a transcript where counsel agreed to defer a ruling on its admissibility and then failed to renew the request to introduce the transcript].) By not seeking to impeach Van Heyningen with the restraining order after she testified on direction examination, Nazir cannot now argue the court abused its discretion in excluding it.

Even if Nazir had not forfeited the argument, the trial court did not abuse its discretion in excluding the 14-year-old restraining order. It is unclear whether and to what extent counsel for Nazir wanted to impeach Van Heyningen with the restraining order or the allegations underlying it. The restraining order, without more, was unlikely to have much effect on Van Heyningen's credibility and thus had little probative

34

value.  On the other hand, the allegations underlying the restraining order were arguably more likely to impact Van Heyningen's credibility.  Indeed, Jimenez's allegations Van Heyningen committed theft and arson (allegations that never led to a criminal conviction) may have cast doubt on Van Heyningen's credibility.  (See *People v. Harris* (2008) 43 Cal.4th 1269, 1291 [witness's failure to comply with probation conditions, including by lying to his probation officer, "show[ed] his lax character and general lack of credibility"].)  But introducing that evidence risked consuming an undue amount of trial time about events that occurred long ago, requiring the court to confront several evidentiary issues regarding the evidence's admissibility,[6] and confusing the issues or misleading the jury by admitting evidence about Jimenez's prior truck, which was the same make and model as the truck Nazir stole.  The trial court acted well within its discretion in excluding the restraining order.

Finally, any error in excluding evidence of the restraining order was harmless.  Van Heyningen's testimony supported Nazir's convictions for grand theft (count 2), making a criminal threat (counts 3 and 4), and unlawful possession of a firearm (count 35).  On all those counts testimony from other witnesses supported Nazir's convictions.  Van Heyningen testified that, as Jimenez's widow, she had lawful possession of the stolen truck, but a representative of the finance company Jimenez used to purchase the truck testified the company owned the truck at the time Nazir stole it.  Either way, it was not Nazir's to take.  Van Heyningen's testimony about Nazir's threats was

---

[6]     For example, the People argue the allegations underlying the restraining order are inadmissible hearsay.

corroborated by the testimony of a Los Angeles County Sheriff's detective who saw text messages Nazir sent Van Heyningen and the photographs depicting dead bodies. And Van Heyningen's testimony Nazir had a gun when he came to her home in September 2018 was corroborated by a man staying at Van Heyningen's house the night Nazir "repossessed" the truck. Thus, even if Nazir had introduced evidence of the restraining order to cast doubt on Van Heyningen's credibility, it is not reasonably probable the result would have been more favorable to Nazir.

> D.     *The Trial Court Did Not Abuse Its Discretion in Denying Nazir's Motion To Compel Discovery*

>       1.     *Additional Factual and Procedural Background*

As discussed, Nazir was a police officer with the Torrance Police Department. According to Nazir, the Torrance Police Department terminated his employment in approximately 2010. He sued the Department for wrongful termination and named its then-Chief of Police, John Neu, as a defendant. According to Nazir, Neu later became the Chief of Bureau Operations for the Los Angeles County District Attorney's Office. Nazir contends that, after Neu joined the District Attorney's Office, someone at that office "specifically requested the Los Angeles County Sheriff's Department . . . open an investigation into [Nazir] for allegedly making a threat against a county official." Nazir contends that investigation led to the charges and convictions in this case.

Before trial Nazir filed a discovery motion to compel the People to give Nazir certain information about the instigation of

36

that investigation.  The People objected to two requests, items 4 and 9, which sought "[a]ny and all communication regarding Mr. Nazir's case from former Chief of the Los Angeles County District Attorney's Office Bureau of Operations John J. Neu" (item 4) and "[a]ny and all police reports or police notes prepared by Los Angeles County Sheriff's Department Detectives Valenzuela and Gentner regarding an alleged threat of a public official by Nazir that occurred on or about September 16, 201[9]" (item 9).  Item 9 also requested "the name of the public official allegedly threatened by Mr. Nazir."

The record does not include the People's objections, but they appear to have been based on a public entity's privilege under Evidence Code section 1040 to withhold official information.[7]  The trial court held an in camera hearing with Deputy District Attorney Monique Preoteasa and Detectives Valenzuela and Gentner to determine whether items 4 and 9 requested information relevant to Nazir's defense. (See *People v. Kelly* (2018) 28 Cal.App.5th 886, 906 [a court may conduct an in camera hearing outside the presence of the defendant and his attorney to review a claim of privilege under Evidence Code section 1040].)  At the hearing the trial court swore in Preoteasa and the detectives, and Preoteasa read into the record the two discovery requests at issue.  The court questioned Preoteasa and the detectives about their

---

[7]     Evidence Code section 1040, subdivision (b), provides that a "public entity has a privilege to refuse to disclose official information," which section 1040, subdivision (a), defines as "information acquired in confidence by a public employee in the course of his or her duty and not open, or officially disclosed, to the public prior to the time the claim of privilege is made."

communications and the communications of others within their departments, if any, with Neu concerning Nazir's case. The court also allowed Preoteasa to question the detectives about their notes and reports, if any, concerning any alleged threat Nazir might have made against a public official. At the end of the hearing the court ruled there were no communications or information responsive to items 4 and 9 that were relevant to Nazir's defense and denied Nazir's motion to compel.

Nazir subsequently asked the court to reconsider its ruling. Nazir argued "[a]ny involvement John Neu had in the investigation, arrest, or filing decision related to Mr. Nazir" would show a "troubling conflict of interest" and "bias in the investigation." Nazir also argued he was entitled to "discovery related to who the public official is and any materials related to that investigation." Nazir contended that Detectives Valenzuela and Gentner prepared reports previously produced in discovery and that he was entitled to any other reports they prepared "in order to fully confront and cross-examine" the detectives at trial.

At the hearing on Nazir's motion for reconsideration, the trial court stated it agreed "entirely" with Nazir's position that, "if John Neu initiated, prompted, . . . originated, or requested [the] investigation of Mr. Nazir, . . . [Nazir] would be entitled to that information . . . ." The court also stated: "Knowing what your theory is and what was disclosed in camera by the detectives and Ms. Preoteasa, my ruling stands. There is nothing to disclose." The court said to counsel for Nazir, "I don't know if that helps any, but—" and counsel for Nazir responded, "I think it does. I think I understand what the court is saying." The court confirmed, "I understand your concern, . . . but there is nothing responsive to your discovery request and the theories of relevance

38

that you have laid out." Counsel for Nazir said, "That was, in fact, a helpful ruling, if I interpreted what you're saying correctly." Detective Valenzuela testified at trial that he and Detective Gentner determined Nazir had not threatened a public official.

Nazir argues the court erred in denying his motion to compel production of documents and information responsive to items 4 and 9 under California's reciprocal discovery statute and *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*). In particular, Nazir argues he "had a right to know whether Mr. Neu was involved in the investigation." If so, according to Nazir, Neu's conflict of interest would bias his investigation and undermine the credibility of Detectives Valenzuela and Gentner, both of whom testified at trial. Nazir also argues he was entitled to know the identity of the public official Nazir allegedly threatened, in order "to 'fully reveal all of the facts' concerning the allegations against Mr. Nazir." Nazir contends denying him access to documents and information responsive to items 4 and 9 violated his rights to due process under the California and United States Constitutions.

2. *The Trial Court Did Not Abuse Its Discretion in Denying Nazir's Motion To Compel*

California's reciprocal discovery statutes (section 1054 et seq.) require "'"'the prosecution to disclose to the defense . . . certain categories of evidence 'in the possession of the prosecuting attorney or [known by] the prosecuting attorney . . . to be in the possession of the investigating agencies.'"'" (*People v. Deleoz* (2022) 80 Cal.App.5th 642, 657 (*Deleoz*); see *People v. Beck and Cruz* (2019) 8 Cal.5th 548, 668.) As relevant

39

here, section 1054.1 requires the prosecution to disclose "[a]ny exculpatory evidence" (§ 1054.1, subd. (e)) and "[r]elevant written or recorded statements of witnesses or reports of the statements of witnesses whom the prosecutor intends to call at the trial" (*id.*, subd. (f)). The reciprocal discovery statutes exclude from disclosure materials and information that are privileged pursuant to an express statutory provision, such as Evidence Code section 1040. (See § 1054.6; *Deleoz*, at p. 659.)

"We review the trial court's ruling denying disclosure . . . under the abuse of discretion standard generally applicable to discovery motions. [Citations.] A violation of the reciprocal discovery obligations constitutes reversible error only where it is reasonably probable, by state law standards, that the omission affected the trial result." (*Deleoz*, *supra*, 80 Cal.App.5th at p. 658; see *People v. Verdugo* (2010) 50 Cal.4th 263, 280.) To prevail on a claim the prosecution violated its duty under section 1054.1, the defendant must show the withheld information was material. (*People v. Lewis* (2015) 240 Cal.App.4th 257, 266.) "Only if the information is discoverable, and . . . [not] privileged, need this court ascertain whether its nondisclosure was prejudicial." (*Deleoz*, at p. 659; see *Lewis*, at p. 266.)

To determine whether the People withheld exculpatory evidence or relevant statements from Detectives Valenzuela and Gentner,[8] we independently reviewed the transcript of the

---

[8] It is unclear whether the reference to "exculpatory evidence" in section 1054.1 includes impeachment evidence. (See *Deleoz*, *supra*, 80 Cal.App.5th at p. 660 & fn. 5; *Kennedy v. Superior Court* (2006) 145 Cal.App.4th 359, 377.) We need not

in camera hearing. (See *People v. Rhoades* (2019) 8 Cal.5th 393, 407-408 [reviewing sealed records and agreeing with two superior courts that the records contained "nothing of significance to the defense"]; *Deleoz, supra,* 80 Cal.App.5th at p. 658 [reviewing privileged documents and concluding the trial court did not abuse its discretion in denying their disclosure].) As the trial court found, none of the witnesses identified any exculpatory or relevant evidence or statements subject to disclosure. Thus, the trial court did not abuse its discretion in denying the motion to compel.[9]

---

decide that issue because, even if "exculpatory evidence" in the statute includes impeachment evidence, the People did not fail to disclose impeachment evidence by not producing privileged documents or information responsive to items 4 and 9.

[9] Nazir argues for the first time in his reply brief the trial court's in camera hearing deprived him of "meaningful participation." Nazir forfeited this argument by not making it in his opening brief (see *People v. Ng* (2022) 13 Cal.5th 448, 568, fn. 13) and, in any event, he does not explain how the traditional process for reviewing the requested disclosure of privileged information violated any right under state or federal law. (See *People v. Superior Court (Barrett)* (2000) 80 Cal.App.4th 1305, 1317 ["The court should hold an in camera hearing when a claim of privilege for official information is made."]; see also *People v. Rhoades, supra,* 8 Cal.5th at pp. 407-408; *People v. Kelly, supra,* 28 Cal.App.5th at p. 906; *People v. Walker* (1991) 230 Cal.App.3d 230, 236-237.) Nor does Nazir argue the information sought was not privileged.

3. *The Information Nazir Requested Was Not Exculpatory or Impeaching Under* Brady

"Under the due process clause of the United States Constitution the prosecution must disclose to the defense any evidence that is 'favorable to the accused' and is 'material' on either guilt or punishment." (*People v. Cook* (2006) 39 Cal.4th 566, 587; see *Brady, supra,* 373 U.S. at p. 87; *People v. Davis* (2014) 226 Cal.App.4th 1353, 1363.) "The United States Supreme Court has identified three components of a *Brady* violation: (1) the evidence at issue must be favorable to the accused because it is exculpatory or impeaching; (2) the evidence must have been suppressed by the state, either willfully or inadvertently; and (3) the defendant must have been prejudiced by the nondisclosure. [Citation.] 'Prejudice' in the context of a potential *Brady* violation turns 'on "the materiality of the evidence to the issue of guilt [and] innocence.""" (*Deleoz, supra*, 80 Cal.App.5th at p. 656; see *Strickler v. Greene* (1999) 527 U.S. 263, 281-282; *People v. Salazar* (2005) 35 Cal.4th 1031, 1043; *In re Hill* (2024) 104 Cal.App.5th 804, 848-849.)

"To demonstrate materiality, a defendant must show a reasonable probability of a different result. [Citation.] The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A reasonable probability of a different result is accordingly shown when the government's evidentiary suppression undermines confidence in the outcome of the trial. [Citation.] In determining whether evidence is material under this standard, we consider the effect of the nondisclosure on defense investigations and trial strategies."

(*Deleoz*, *supra*, 80 Cal.App.5th at p. 656, internal quotations omitted; see *Kyles v. Whitley* (1995) 514 U.S. 419, 434; *People v. Williams* (2013) 58 Cal.4th 197, 256; *People v. Salazar, supra*, 35 Cal.4th at p. 1043.) "On appeal, we independently review whether a *Brady* violation occurred." (*Deleoz*, at p. 656; see *Salazar*, at p. 1042 ["Conclusions of law or of mixed questions of law and fact, such as the elements of a *Brady* claim [citation], are subject to independent review."].)

There was no *Brady* violation here because, as we confirmed from our review of the transcript of the in camera hearing, the information Nazir sought was not exculpatory or impeaching. The trial court told counsel for Nazir as much when the court said that it agreed with Nazir's concerns about Neu's potential involvement and that there was nothing to disclose. Moreover, so long as the public official Nazir allegedly threatened, if any, was not Neu or another person with authority to affect the investigation, the identity of that official (again, if any) was not relevant to Nazir's convictions on the charges the People alleged. The People did not charge Nazir with threatening a public official, and none of the incidents that led to his convictions had anything to do with threatening a public official. Thus, even if the identity of the public official (if any) were exculpatory or impeaching, that person's identity was not material to Nazir's guilt or innocence. (See *People v. Lewis*, *supra*, 240 Cal.App.4th at p. 263 [no *Brady* violation where the undisclosed information was immaterial to the defendant's guilt

43

and did not undermine the reviewing court's confidence in the verdict].)[10]

E. *The Trial Court Must Resentence Nazir and Balance Mitigating and Countervailing Factors in Determining Whether To Dismiss the Enhancements*

1. *Additional Factual and Procedural Background*

As discussed, the People alleged, and the jury found, that a principal was armed with a firearm in the commission of a felony (§ 12022, subd. (a)(1)) in connection with count 11 and that Nazir personally used a firearm (§ 12022.53, subd. (b)) in connection

---

[10] Counsel for Nazir argued for the first time at oral argument that (1) the deputy district attorney mischaracterized item 4 as requesting communications "to the [deputy district attorneys] prosecuting the case" instead of "all" communications from Neu, and the trial court went "along with that mischaracterization"; and that (2) the People may have withheld from the in camera hearing emails between Neu and other deputy district attorneys. Nazir forfeited these arguments by failing to make them in the trial court or in his opening or reply brief on appeal. (See *People v. Arredondo* (2019) 8 Cal.5th 694, 710, fn. 5 [failure to raise an issue until oral argument forfeits the issue]; *People v. Carrasco* (2014) 59 Cal.4th 924, 990 ["'Obvious reasons of fairness militate against consideration of an issue raised initially' at oral argument."]; *People v. Thompson* (2010) 49 Cal.4th 79, 110, fn. 13 [raising an argument for the first time at oral argument is "improper"].) In any event, as discussed, the transcript of the in camera hearing confirms the People did not withhold any exculpatory or impeaching evidence from Nazir.

44

with count 22.  Those sentence enhancements imposed additional prison terms of one and 10 years, respectively.[11]

Nazir moved under section 1385, subdivision (c), to dismiss the sentence enhancements and sought a new trial on the enhancement under section 12022.53, subdivision (b).  Nazir argued the sentence enhancements could result in a sentence of over 20 years, a factor the court must consider in determining whether to dismiss an enhancement in the interests of justice. (See § 1385, subd. (c)(2)(C).)

The court denied both motions.  Regarding the new trial motion, the court stated, "Having considered not only the arguments contained in the moving papers but the arguments here in court, also considering the testimony and the evidence that I saw and heard during this trial, respectfully, I believe that the evidence supported the enhancement" under section 12022.53, subdivision (b).  The court stated it read two appellate decisions concerning a trial court's discretion to substitute a more lenient prison term in the event it dismissed an enhancement under section 12022.53, subdivision (b).[12]  The

---

[11]  In 2022 the People moved to dismiss the sentence enhancements pursuant to a policy adopted at the time by the Los Angeles County District Attorney's Office.  The trial court denied the motion, and Nazir filed a petition for writ of mandate, which we granted.  (See *Nazir v. Superior Court* (2022) 79 Cal.App.5th 478.)  Subsequently, the People did not renew their motion to dismiss the sentence enhancements.

[12]  The court identified *People v. Lewis* (2022) 86 Cal.App.5th 34, disapproved in *People v. McDavid* (2024) 15 Cal.5th 1015, and *People v. Johnson* (2022) 83 Cal.App.5th 1074.

court denied Nazir's motion to dismiss the enhancements under section 1385, stating, "I'm declining to exercise my discretion under [section 1385], respectfully. . . . Again, it's based upon the evidence that I heard in this case."

Before sentencing Nazir, the court stated it "considered factors in mitigation . . . mentioned in [Nazir's] sentencing memorandum," including that Nazir had no prior criminal history. The court also acknowledged "the allegation of an enhancement that could result in a sentence of over 20 years" and "multiple enhancements being alleged in a single case" were mitigating factors under the California Rules of Court. (See Cal. Rules of Court, rule 4.423(b)(10) & (11).) After stating it "listened very carefully to the evidence in this case," the court sentenced Nazir to an aggregate prison term of 27 years. Nazir argues the court, in denying his motion to dismiss the sentence enhancements, failed to properly consider the length of his sentence.[13] This time, we agree with Nazir.

> 2. *Applicable Law and Standard of Review*

Section 1385, subdivision (c)(1), provides "the court shall dismiss an enhancement if it is in the furtherance of justice to do so," except in circumstances not relevant here. Section 1385,

---

[13] The People also alleged and proved multiple sentence enhancements, which is a factor the court must consider in deciding whether to dismiss a sentence enhancement under section 1385, subdivision (c). (See § 1385, subd. (c)(2)(B).) Nazir does not argue the trial court erred in considering that factor. Because we are directing the trial court to reconsider Nazir's motion to dismiss, however, the trial court should consider all relevant factors in reconsidering his motion, including the allegation of multiple sentence enhancements. (See *ibid.*)

subdivision (c)(2), provides that in exercising its discretion under subdivision (c), the court must consider and "afford great weight to evidence offered by the defendant to prove" any of nine listed mitigating factors (see § 1385, subd. (c)(2)(A)-(I)), "unless the court finds that dismissal of the enhancement would endanger public safety" (§ 1385, subd. (c)(2)). Those mitigating factors include that "[t]he application of an enhancement could result in a sentence of over 20 years." (§ 1385, subd. (c)(2)(C).) In that instance, section 1385, subdivision (c)(2)(C), states "the enhancement shall be dismissed."

Despite that mandatory language, our court (see *People v. Anderson* (2023) 88 Cal.App.5th 233, 239) and numerous others have held section 1385, subdivision (c)(2)(C), permits, but does not require, a court to dismiss an enhancement that could result in a sentence of over 20 years. (See *People v. Mazur* (2023) 97 Cal.App.5th 438, 445; *People v. Cota* (2023) 97 Cal.App.5th 318, 337; *People v. Renteria* (2023) 96 Cal.App.5th 1276, 1289-1290; *People v. Mendoza* (2023) 88 Cal.App.5th 287, 294; *People v. Lipscomb* (2022) 87 Cal.App.5th 9, 18; see also *Walker*, *supra*, 16 Cal.5th at p. 1035, fn. 5 [declining to decide whether "shall be dismissed" in another mitigating factor (multiple enhancements under subdivision (c)(2)(B)) deprived the trial court of its discretion to impose an enhancement under section 12022.53, subdivision (b)].) Indeed, "trial courts retain their discretion to impose an enhancement based on circumstances 'long deemed essential to the "furtherance of justice" inquiry.'" (*Walker*, at p. 1033; see *People v. Bravo* (2025) 107 Cal.App.5th 1144, 1157; *People v. Ortiz* (2023) 87 Cal.App.5th 1087, 1099.)

"[S]ubdivision (c)(2)'s mandate to give 'great weight' to enumerated mitigating circumstances requires a sentencing court

to 'engage[ ] in a holistic balancing with *special emphasis* on the enumerated mitigating factors.'" (*Walker*, *supra*, 16 Cal.5th at p. 1034; see *People v. Ortiz*, *supra*, 87 Cal.App.5th at p. 1096.) "More precisely, a court *must dismiss* an enhancement when an enumerated mitigating circumstance is present 'in the absence of "substantial evidence of countervailing considerations of sufficient weight *to overcome* the recommendation."'" (*Walker*, at p. 1035.) "In other words, if the court does not find that dismissal would endanger public safety, the presence of an enumerated mitigating circumstance will generally result in the dismissal of an enhancement unless the sentencing court finds substantial, credible evidence of countervailing factors that 'may nonetheless neutralize even the great weight of the mitigating circumstance, such that dismissal of the enhancement is not in furtherance of justice.'" (*Id.* at p. 1029; see *Ortiz*, at p. 1098.) "Without credible evidence to support findings on aggravating circumstances, judges could disregard mitigating factors without a proper basis for doing so. This would be incompatible with the 'great weight' the Legislature has attached to the enumerated mitigating circumstances." (*Walker*, at p. 1036.) "Stated simply, if the court does not conclude that dismissal would endanger public safety, then mitigating circumstances strongly favor dismissing the enhancement. But ultimately, the court must determine whether dismissal is in furtherance of justice." (*Ibid.*)

We review a trial court's order denying a motion to dismiss a sentence enhancement under section 1385 for abuse of discretion. (*People v. Carmony* (2004) 33 Cal.4th 367, 373-374; *People v. Mendoza*, *supra*, 88 Cal.App.5th at p. 298.) The trial court may abuse its discretion where the court based its decision on impermissible factors or an incorrect legal standard. (*People*

*v. Gonzalez* (2024) 103 Cal.App.5th 215, 225; see *People v. Knoller* (2007) 41 Cal.4th 139, 156.)

### 3. *The Trial Court Must Exercise Its Discretion Under* Walker

The trial court sentenced Nazir in November 2023, before the Supreme Court's August 2024 decision in *Walker*, *supra*, 16 Cal.5th 1024. As a result, the trial court did not have the advantage of the legal framework *Walker* established for applying section 1385, subdivision (c)(2).

That framework requires the trial court to consider first whether dismissing a sentence enhancement would "endanger public safety." (§ 1385, subd. (c)(2).) If so, the trial court need not consider the mitigating factors listed at section 1385, subdivision (c)(2)(A)-(I), and may deny a motion to dismiss the enhancement. (See *Walker*, *supra*, 16 Cal.5th at p. 1033 ["in most cases, 'if the trial court finds that dismissal of an enhancement would endanger public safety, then it is hard to see how dismissal would further the interests of justice,' notwithstanding the applicability of any mitigating factors identified in subdivision (c)(2)"]; *People v. Mendoza*, *supra*, 88 Cal.App.5th at p. 297, fn. 6 [same].) If the court does not find or consider whether dismissal would endanger public safety, then it must consider whether the defendant has provided evidence that one or more of the mitigating factors exists. (See § 1385, subd. (c)(2).) And if so, the court must, as stated, "'engage[ ] in a holistic balancing with special emphasis on the enumerated mitigating factors'" by considering whether there is "substantial, credible evidence of countervailing factors that 'may nonetheless neutralize even the great weight of the mitigating

49

circumstance[s], such that dismissal of the enhancement is not in furtherance of justice.'" (*Walker*, at pp. 1036, 1029, italics omitted; see *People v. Ortiz*, *supra*, 87 Cal.App.5th at p. 1098.)

The trial court did not find dismissing a sentence enhancement would endanger public safety. Nor does it appear the court gave "great weight" to the possibility that imposing the enhancement under section 12022.53, subdivision (b), could result in a sentence of over 20 years or balanced that mitigating factor against any substantial, credible evidence of any countervailing factors. (See § 1385, subd. (c)(2); *Walker*, *supra*, 16 Cal.5th at pp. 1029, 1034.) The court merely cited the evidence it heard in the case and denied Nazir's motion to dismiss. Though the court acknowledged a sentence of over 20 years was a mitigating factor under the California Rules of Court, there is no indication the court gave that factor "'great weight'" or "'special emphasis'" to satisfy section 1385, subdivision (c)(2), under *Walker*. (See *Walker*, at p. 1034.)

The People argue the evidence the trial court considered and found substantial in rejecting Nazir's motion for a new trial on the firearm enhancement under section 12022.53, subdivision (b), supported the court's decision denying the motion to dismiss. But merely finding substantial evidence supported an enhancement does not involve balancing that evidence or any countervailing factors against the "great weight" of a mitigating factor like the possibility of imposing a sentence of over 20 years. (See § 1385, subd. (c)(2); *Walker*, *supra*, 16 Cal.5th at p. 1034.) The People also argue substantial evidence supported several aggravating factors the jury found true, including that Nazir abused a position of trust (Cal. Rules of Court, rule 4.421(a)(11)) and preyed on vulnerable victims (*id.*, rule 4.421(a)(3)). But as

50

the People acknowledge, the court refused to consider those factors in sentencing Nazir because the court did not properly instruct the jury on them.[14]  Because the trial court refused to consider those factors in sentencing Nazir, the court did not consider them in exercising its discretion to deny Nazir's motion to dismiss the sentencing enhancements.

Finally, the People argue the court did not have to explain its reasons for denying Nazir's motion to dismiss the sentence enhancement.  In general, "no particular language [is] required for the trial court to decline to dismiss" a sentence enhancement. (See *People v. Bravo*, *supra*, 107 Cal.App.5th at p. 1157.)  Indeed, section 1385, subdivision (a), requires a trial court to state its reasons for dismissing an action "'orally on the record,'" but "there is no similar statutory requirement when a court denies a request to dismiss an enhancement." (*Bravo*, at p. 1157; but see *Walker*, *supra*, 16 Cal.5th at p. 1036, fn. 6 [a "statement of reasons" for declining to dismiss a sentence enhancement serves "'a number of interests,'" including "'meaningful review of the decision'" and "'preserving public confidence in the decision-making process "by helping to persuade the parties [and the public] that . . . decision-making is careful, reasoned and equitable"'"].)  And we generally assume "the trial court is aware of the applicable law, including statutory discretion at sentencing." (*People v. Gutierrez* (2009) 174 Cal.App.4th 515, 527; see *Bravo*, at p. 1157; *People v. Coleman* (2024) 98 Cal.App.5th 709, 724-725.)  Thus, "we cannot presume error

---

[14]   The trial court instructed the jury on aggravating factors using the California Rules of Court instead of new pattern instructions.  The court also denied the People's motion for a new trial on the aggravating factors on that basis.

where the record does not establish on its face that the trial court misunderstood the scope of that discretion." (*Gutierrez*, at p. 527; see *People v. Lee* (2017) 16 Cal.App.5th 861, 867 ["if the record is silent" on the court's awareness of its discretionary authority in sentencing, we must presume the court understood the scope of its discretion and affirm].)

But here, where the trial court did not have the benefit of *Walker*, the record establishes the court, in denying Nazir's motion to dismiss the sentence enhancements, did not give great weight to the length of Nazir's sentence or consider whether countervailing factors "neutralize[d]" that factor. (See *Walker*, *supra*, 16 Cal.5th at pp. 1029, 1034.) Instead, the court cited only the "evidence" generally, or perhaps all of it, in denying the motion and mentioned the duration of Nazir's sentence as a mitigating factor only at sentencing, not when ruling on the motion to dismiss. Thus, the trial court applied an incorrect legal standard in denying Nazir's motion to dismiss the sentence enhancements. (See *People v. Gonzalez*, *supra*, 103 Cal.App.5th 215, 231 [trial court abused its discretion by applying the wrong legal standard to determine whether dismissing a sentence enhancement would endanger public safety under section 1385, subdivision (c)(2)]; see also *People v. Rogers* (2025) 108 Cal.App.5th 340, 365-366 [court abused its discretion in failing to balance the relevant interests and factors in determining whether the defendant fell outside the spirit of the three strikes law].)

The trial court's error was prejudicial because the record does not "clearly indicate" the court would have denied Nazir's motion to dismiss the sentence enhancements had the court applied the legal standard set forth in *Walker*. (See *People v.*

*Gutierrez* (2014) 58 Cal.4th 1354, 1391 [where the trial court fails to exercise ""'"informed discretion,"'"" the "appropriate remedy is to remand for resentencing unless the record 'clearly indicate[s]' that the trial court would have reached the same conclusion 'even if it had been aware that it had such discretion'"].) Therefore, we vacate the sentence and direct the trial court to resentence Nazir, including by reconsidering Nazir's motion to dismiss the sentence enhancements in light of *Walker*. (See *People v. Gonzalez, supra*, 103 Cal.App.5th at p. 232.)

## DISPOSITION

Nazir's convictions are affirmed. The sentence is vacated, and the trial court is directed to reconsider Nazir's motion to dismiss the sentence enhancements under section 1385, subdivision (c)(2), and to resentence Nazir.


SEGAL, J.


We concur:



MARTINEZ, P. J.



STONE, J.